BECKER, Judge.
The defendant, Anthony Lubrano, was indicted by a grand jury on six counts of public payroll fraud, a violation of L.S.A.R.S. 14:138. He was found guilty as charged on all counts by a jury. Thereafter, he was sentenced to eighteen months at hard labor on each count, the sentences to run concurrent, the execution of the sentences suspended and the defendant was placed on active probation for eighteen months with the condition he perform one hundred hours of community service work. He was also fined $200.00 and ordered to pay $155.00 court costs or serve an additional 30 days in jail.
The defendant was a New Orleans Police Officer in the First District. He was assigned to a foot patrol on Royal Street in the French Quarter. He reported for roll call at 10:00 a.m. and would end his shift at 6:00 p.m. The defendant also worked on the security detail for the filming of the movie “French Quarter Undercover” during August and September of 1984.
When the defendant would report for duty at the First District, his name would be entered into the “Beat Roll Book” by Sergeant John Alesich, and would be checked by Lieutenant John Schluter. According to the roll book for the pertinent times in question, the defendant was assigned as follows:
(1) August 16, 1984 — 10:00 a.m. to 6:00 p.m. Royal Street
(2) August 31, 1984 — 10:00 a.m. to 6:00 p.m. unit number 100
(3) September 4, 1984 — 8:00 a.m. to 4:00 p.m. Royal Street
(4) September 5, 1984 — 10:00 a.m. to 6:00 p.m. Royal Street
(5) September 7, 1984 — 10:00 a.m. to 6:00 p.m. Royal Street
(6) September 13, 1984 — 10:00 a.m. to 6:00 p.m. Royal Street
The entries from the roll book would then be used to compile defendant’s time (RAMS) cards. Defendant was supposed to sign the RAMS card, but Sergeant Ale-sich was allowed to sign it if the officer could not. Sergeant Alesich signed the defendant’s RAMS cards for the weeks of August 12 through August 18, August 26 through September 30 and, September 2 and September 8. Defendant signed his RAMS card for the week of September 9 through September 15. Each of the RAMS cards showed defendant as working on August 16 and 31, September 4, 5, 7 and 13.
According to Mark Hebert, executive producer of “French Quarter Undercover,” defendant worked the following hours on the security detail:
(1) August 16, 1984 — 6:00 a.m. to 6:00 p.m..
(2) August 31, 1984 — 8:00 a.m. to 4:00 p.m.
*1285 (3) September 4, 1984 — 2:00 p.m. to 4:00 p.m.
(4) September 5, 1984 — 7:00 a.m. to 12:00 noon
(5) September 7, 1984 — 8:00 a.m. to 6:00 p.m.
(6) September 13, 1984 — 1:00 p.m. to 8:00 p.m.
Captain Dan McMullen was in charge of coordinating security for the movie detail. Captan McMullen kept up with the number of hours each officer worked and filled out their time cards. When the filming began, the officers working the detail were guaranteed a minimum of eight hours pay even if no filming took place. After the movie started having financial problems, the minimum was reduced to four hours. The financial problems also led to a three day strike by the Screen Actors Guild, apparently in early September, but not on dates security was paid for, according to Richard Lazes, production manager for the movie.
The defendant stated he had no independent recollection of what occurred on those particular dates, but he specifically denied working on the movie detail when he was supposed to be on his beat. Defendant pointed out that he would be regularly cheeked during his duty hours either by Sergeant Alesich or Lieutenant Schluter. Captain McMullen testified he did not recall ever seeing the defendant on the movie set while he was supposed to be on his beat. Sergeant Mike Edelman of the Internal Affairs Division investigated the defendant and the movie security detail. He looked at radio calls which were made to the defendant and found discrepancies between those calls and the entries on the roll book. On September 5th the roll book showed the defendant as working from 10:00 a.m. to 6:00 p.m., but he actually worked from 3:00 p.m. to 11:00 p.m. On September 7th defendant “logged on” his radio at 8:54 a.m. and “logged off” at 8:58 a.m. even though the roll book had him working from 10:00 a.m. to 6:00 p.m. Sergeant Edelman also noted that on August 31st defendant “logged on” at 3:44 p.m. and “logged off” at 6:01 p,m. An officer could not receive a call from the dispatcher unless he was on duty.
ERRORS PATENT
A review of the record reveals no errors patent. However, it must be noted that defendant is now being represented by OIDP and his sentence includes jail time should he fail to pay court costs by May 4, 1988. The minute entry of October 28, 1988, shows that the costs were paid, thus making moot any error regarding invalidity of that portion of the sentence.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant claims his being charged with six separate offenses of public payroll fraud violates the constitutional ban against double jeopardy. He asserts he is receiving multiple punishments when only one offense was committed.[1]
The Louisiana Supreme Court rejected the same argument in State v. Joles, 492 So.2d 490 (La.1986) where the defendant; a police jury president, was charged with thirty five counts of theft from the parish police jury. The defendant pled nolo con-tendere to twenty counts and the court divided the counts into four groups of five counts each. He was sentenced to one year on each count in the first group, two years on each count in the second group, five years on each count in the third group and seven years on each count in the fourth group. The sentences in each group ran concurrently, but each group of concurrent sentences ran consecutively, giving the defendant a total of fifteen years. The defendant argued that the sentences were illegal because the maximum sentence for theft over $500.00 was ten years. The Supreme Court found in affirming the defendant’s sentence, that the legislative intent behind L.S.A.-R.S. 14:67 gave the State the option of charging the defendant with a number of distinct thefts by aggregating them in one count or in separate counts of one or more bills of information.
*1286 Defendant asserts that, unlike R.S. 14:67, the legislative intent behind R.S. 14:138 is unclear. There is nothing in the statute that can be read as favoring separate punishments for separate offenses that are a part of a common scheme over a single punishment for one continuous offense. The defendant argues that the rule of lenity in statutory construction applies so that the lesser punishment should be imposed, State v. Boowell, 406 So.2d 213 (La.1982).
In State v. Simpson, 464 So.2d 1104 (La.App. 3rd Cir.1985) the defendant was convicted of three counts of simple criminal damage to property. The defendant and two others cut down over two miles of continuous barbed wire fence on three adjacent tracks of land in one night. The defendant argued he should not have been charged with three counts because there was only one act of criminal conduct. The Third Circuit found that although the offenses arose out of the same act and were part of a common scheme, the defendant knowingly and intentionally damaged the property of three different owners. Therefore, the defendant committed three separate offenses, and he was not subjected to double jeopardy.
In this particular matter, although the separate acts may have resulted from one scheme, the defendant on six separate occasions, August the 16th and 31st, September 4, 5, 7 and 13, was carried in the First District roll book as being on duty when he was instead working as security on the movie detail. Thus he committed six separate acts of public payroll fraud. Accordingly, this assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 2
Defendant argues in assignment of error number 2 that R.S. 14:138 is unconstitutionally vague because the statute fails to provide an ascertainable standard of guilt.
R.S. 14:138 states:
Public pay roll fraud is committed when:
(1) Any person shall knowingly receive any payment or compensation, or knowingly permit his name to be carried on any employment list or pay roll for any payment or compensation from the state, for services not actually rendered by himself, or for services grossly inadequate for the payment or compensation received or to be received according to such employment list or pay roll; or
(2) Any public officer or public employee shall carry, cause to be carried, or permit to be carried, directly or indirectly, upon the employment list or pay roll of his office, the name of any person as employee, or shall pay any employee, with knowledge that such employee is receiving payment or compensation for services not actually rendered by said employee or for services grossly inadequate for such payment or compensation.
The article shall not apply in a situation where a bona fide public officer or public employee, who is justifiably absent from his job or position for a reasonable time, continues to receive his usual compensation or a part thereof.
Whoever commits the crime of public pay roll fraud shall be fined not more than one thousand dollars, or imprisoned, with or without hard labor, for not more than two years, or both.
Defendant specifically complains that the statute does not define a level at which services will be considered “grossly inadequate for the payment or compensation received or to be received.”
This issue was dealt with in State v. Gisclair, 363 So.2d 696 (La.1978). The defendant claimed that the term “grossly inadequate” in R.S. 14:138 was unconstitutionally vague, and the trial court found the statute to be vague because a reasonable man could not understand what was criminal and what was not. The Supreme Court reversed and found that ordinary persons of reasonable intelligence were capable of discerning the prohibition against the payment for services “grossly inadequate” for such compensation. Gisclair is *1287 still the controlling authority. This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 3
Assignment of Error No. 3 was taken when the trial court admitted the payroll records into evidence. This assignment of error was not briefed by defense counsel and thus should be deemed abandoned. Uniform Rules — Court of Appeal, Rule 2-12.4. However, the defendant has filed a pro se brief urging the acceptance of this assignment. In considering this assignment we find that there were no objections during the trial to the introduction of these records and therefore any objection to the introduction is deemed waived. C.Cr.P. Article 841; State v. Jackson, 450 So.2d 621 (La.1984), State v. Obran, 496 So.2d 1132 (La.App. 4th Cir. 1986).
ASSIGNMENT OF ERROR NO. 4
In his final assignment of error, defendant claims there is insufficient evidence that he is guilty of public payroll fraud. He argues the payroll records from the NOPD and the movie cannot be relied upon to prove he worked the movie detail at the time he was on his beat. Defendant asserts the records are so full of inaccuracies, discrepancies and errors that they are not credible evidence upon which to base a finding of guilt.
The standard for reviewing a claim of insufficient evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Fuller, 414 So.2d 306 (La.1982).
In State v. Mussall, 523 So.2d 1305, 1311 (La.1988), the Supreme Court stated:
(1) After reviewing Jackson and the foregoing authorities, we conclude that a reviewing court may not disregard its duty under due process of law as interpreted by Jackson v. Virginia, simply because the record contains testimony which tends to support each fact necessary to constitute the crime. If the court finds that no rational trier of fact viewing all of the evidence from a rational pro-prosecution standpoint could have found guilt beyond a reasonable doubt, the conviction cannot stand constitutionally. The actual trier of fact’s rational credibility calls, evidence weighing and inference drawing are preserved through the requirements that upon judicial review all of the evidence is to be considered as if by a rational fact finder in the light most favorable to the prosecution, and by the admonition that the sufficiency inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Thus, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.
The Supreme Court further stated that under Jackson v. Virginia, supra, the reviewing court is not permitted to consider just the evidence most favorable to the prosecution but to consider the whole record since that is what a rational trier of fact would do.. Id. 523 So.2d at 1310. If rational triers of fact could disagree as to the interpretation of the evidence, the decision to convict should be upheld. Id.
When the conviction is based on circumstantial evidence, R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. State v. Camp, 446 So.2d 1207 (La.1984); State v. Woods, 526 So.2d 443 (La.App. 4th Cir.1988). It does not establish a stricter standard of review, but is merely an evidentia-ry guide for the jury when it is considering circumstantial evidence. State v. Porretto, 468 So.2d 1142 (La.1985); State v. Cass, 514 So.2d 589 (La.App. 4th Cir.1987).
If a ease involves circumstantial evidence and the finder of fact reasonably rejects the defendant’s hypothesis of innocence, *1288 the hypothesis fails; and the defendant is guilty unless another hypothesis raises a reasonable doubt. State v. Captville, 448 So.2d 676 (La.1984); State v. Langford, 483 So.2d 979 (La.1986); State v. Woods, supra.
There is no direct evidence that defendant was working the movie detail while he was supposed to be on his beat on the dates in question. To prove defendant had reported for duty on each of those dates, the State relied upon the roll book and the time (RAMS) cards which were compiled from the roll book. To prove defendant was working the movie detail, the State used the time cards and call sheets from the movie, together with a number of witnesses.
Sergeant John Alesich testified he maintained the “beat roll book” for the defendant’s police district and that to have an officer’s name entered into the book and thus establish his presence at work, an officer must attend roll call. Sergeant Ale-sich further testified that the defendant was carried on the book at the times charged and he was assigned to specific work details. He also explained the time (RAMS) cards, their coding and how the beat roll book is used at the end of the week to work up the RAMS card. Sergeant John Cornwell, a Louisiana State Police Officer, testified he was in charge of the beat roll book on certain occasions and further testified that on the days designated the defendant did not ask for time off. Janice Rousell, of the Personal Division of the Police Department, explained the use of the RAMS card and that an officer’s pay was determined from the information contained on that card. Wayne Delarge, comptroller for The City of New Orleans, explained how a paycheck is generated from the hours on the card. He further testified that he examined the records of the defendant and that those records indicated that the defendant was paid on the days in question.
With regard to the movie production, “French Quarter Undercover”, Mark Hebert, the executive producer, identified the time cards of the defendant for the pertinent days and times in question. Karen Button, the bookkeeper, testified how she made up checks from the time cards and Richard Lazes, the production manager, testified how he scheduled the personnel including security and how a check was run to make sure the number of police officers requested were present.
Defendant assails this evidence, particularly that from the movie. With regard to the roll book and the RAMS cards, defendant points out that Sergeant Alesich would sign the individual officer’s names in both the roll book and on the RAMS cards, and that in 1987, the NOPD changed the rules to require that the officers themselves review" their hours for accuracy. Defendant also points to the testimony of Sergeant Cornwell' of the State Police who admitted making mistakes in the roll book and who could not account for the use of correction fluid, or white-out, in the roll book when such was prohibited.
As to the records from the movie, the defendant points to the financial problems that led to the inability of the producers to make the payroll. He emphasizes the testimony of the bookkeeper, Karen Button, who called the production a “menagerie” and that the time cards were not accurate. Defendant also points to the testimony of Richard Lazes, the movie’s production manager, who decided how much security would be needed at the next day’s shooting. Lazes testified there were instances where one officer began the security detail but would have another officer relieve him when he had to go on duty. The hours worked would be credited to the first officer, and it was between the officers to split the pay.
The jury’s verdict of guilty shows that it must have believed the records from the NOPD and the movie accurately reflected the situation, and thus they believed defendant was working on the movie detail while he was supposed to be on duty. Looking at all of the evidence in the light most favor *1289 able to the prosecution, a rational trier of fact could have found that the defendant committed public payroll fraud. This assignment of error is therefore without merit.
Accordingly, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. In his brief, defendant states he is not arguing the charges are duplicitous as was argued in State v. Defraites, 449 So.2d 540 (La.App. 4th Cir. 1984).