563 So.2d 847 (1990)
STATE of Louisiana
v.
Anthony LUBRANO.
No. 89-K-2904.
Supreme Court of Louisiana.
June 14, 1990.
Dwight Dosky, for Anthony Lubrano.
Harry F. Connick, Dist. Atty., Jack Peebles, Asst. Dist. Atty., for State.
PER CURIAM:
The defendant was charged by bill of information with six counts of public payroll fraud in violation of La.R.S. 14:138. After trial by jury, he was found guilty as charged on all counts. The trial court sentenced him to concurrent terms of eighteen (18) months' imprisonment at hard labor on each count. The court suspended the sentences and placed the defendant on active probation for eighteen (18) months. On appeal, the Fourth Circuit affirmed the defendant's convictions and sentences, rejecting three assignments of error. State v. Lubrano, 550 So.2d 1283 (La.App. 4th Cir. 1989). We granted certiorari in order to review the court of appeal's treatment of defendant's third assignment of error, challenging the sufficiency of the evidence to convict him. We now reverse.
La.R.S. 14:138 required the state to prove beyond a reasonable doubt at trial that the defendant, a New Orleans Police Officer assigned to foot patrol on Royal Street in the French Quarter during the summer of 1984, knowingly received payment for services not actually rendered or for services "grossly inadequate for the payment or compensation received or to be received according to such employment list or pay roll...." According to the state's theory of the case, the defendant fraudulently "double dipped" the City of New Orleans by receiving compensation from the city for walking his beat in the French Quarter on six days in August and September of 1984, when, in fact, he was working a security detail for a movie project entitled "French Quarter Underground."
No witness came forward to testify at trial that he had seen defendant working the security detail at a time he should have been walking his beat. The state's case relied entirely upon the circumstantial inferences *848 arising from the discrepancies between two sets of documents. The state produced the First District's "beat roll" book and defendant's payroll (RAMS) cards indicating that he had worked an eight-hour shift (10:00 a.m. to 6:00 p.m.) on the six days in August and September, 1984, specified in the bill of information. The state also produced the paychecks issued by the City of New Orleans corresponding to the pay periods on the payroll cards. The checks had been endorsed and cashed by the defendant.
Testimony at trial established that defendant's immediate supervisor, John Alesich, filled in the hours on the defendant's payroll card and then signed defendant's name to it, a customary practice at the time. Nevertheless, each officer was responsible for the accuracy of his payroll records, and a rational trier of fact could reasonably determine that the payroll cards used to generate the checks cashed by the defendant represented an accurate statement of the hours he claimed to have worked on those six days.
The state also produced time cards purporting to show the hours and days the defendant spent working the security detail for the movie production, "French Quarter Underground." The cards revealed clear conflicts with the defendant's police payroll records for the six days specified in the bill of information. On September 7, 1984, for example, when the defendant was supposed to be walking his beat on Royal Street in the French Quarter, the movie records showed him working a security detail from 8:00 a.m. to 6:00 p.m. According to the movie call sheets, September 7 involved filming at "Landmark and the French Market, and all over Bourbon Street," locations removed from the defendant's regular "beat." Similar conflicts existed for the other five days charged against defendant in the bill of information. The cards were the responsibility of Captain Don McMullen, who kept a running total of each man's hours through the week and then went back and entered the hours on the time cards "on a daily basis, in order to include the proper total amount of hours."
The state also produced checks corresponding to the defendant's time cards made out on two accounts at the First National Bank of Commerce. Two of the checks had been signed by Mark Hebert, the executive producer of the movie, and cashed by the defendant. These checks totaled $825.00 and purportedly compensated the defendant for working on two of the days alleged in the bill of information. Two other checks, totaling $645.00, purportedly compensated the defendant for working on the other four days charged in the bill of information.
The latter checks were not signed by Hebert, and were marked "VOID." According to Hebert's testimony at trial, these void checks were made out for accounting purposes, as a way of keeping track of cash payments, or payments by way of cashier's checks, to the officers working the detail. Financial difficulties had forced Hebert to adopt this system after checks to the police officers working security and to the crew bounced because of insufficient funds in the various bank accounts maintained to finance the film. Hebert had recruited a part-time accountant, Karren Button, who worked on weekends to straighten out the "menagerie that was going on during the week...." Financial chaos had overtaken the movie at the end of August and in September of 1984, and one work stoppage called by the Screen Actors Guild brought filming to a stop temporarily.
State as well as defense witnesses agreed at trial that the film time cards were accounting devices intended only to keep an accurate record of the number of hours worked by the security detail. State witness Richard Lazes, production manager for "French Quarter Underground," testified that he approved the times submitted by Captain McMullen for payment. "We wouldn't check them individually," Lazes told the jurors, "We'd check them in groups ... We weren't really concerned with which officers were working. We were only concerned with the right number of officers, so we would then, at the end of the week, tally the total number of hours to make sure that we were as close as *849 possible to the amount of bills for the amount of people we had requested initially at the beginning of that week...." It was possible, according to Lazes, that more than one officer could share the same time card and split payment for the time reflected on the card. His main interest was that "we had a certain amount of officers, and that we were paying for a certain amount of hours." Lazes acknowledged that financial difficulties had shut down filming on several occasions but testified that the police were still paid for those days according to a guaranteed four-hour minimum. Lazes also cautioned that the movie call sheets were simply projections made by the production crew on the night before the next day's shooting and did not necessarily indicate that shooting had gone forward as planned.
Karen Bates, the accountant and a state witness at trial, recalled that on occasion the film's director, Joseph Catalanotto, told her to make up for miscalculations of an officer's pay by simply adding hours to the next week's time cards. Ms. Button further testified that it was possible that nothing had taken place with regard to the movie on at least one of the days in question, but that the defendant received payment pursuant to an agreement which guaranteed an officer at least four hours of pay for merely showing up. Ms. Button could not say that the defendant worked on the movie set on the days in question. She did testify that the dates on the time cards did not make any difference to her so long as the officers were given the proper amount of money according to the time cards.
Joseph Catalanotto, who testified for the defense, readily agreed that he had instructed his secretary, a Miss Smith, to make up the time cards to match the checks they were issuing. "... I'd make a check out for X-amount of dollars," Catalanotto told the jury, "and we would make the time card up just to fit that check, just so we could put it into the files ... to have complete records of it." Captain McMullen, who also testified for the defense, agreed that "... there were times when an officer is carried working on a given day when he did not actually work that day. He worked that same number of hours, total number of hours during that week, but not necessarily the specific hours and days." McMullen also acknowledged that "[w]e had an occasion or two where, because of the NSF checks, and because of not getting paid, where the other members of the crew, the cameramen and other people that handle the sets and what have you, refused to work, after everyone had showed up to go to work, so on those days the officers who showed up were carried eight hours working on the movie detail, whereas in fact they really weren't on duty at the movie detail. So ... those people could conceivably have gone back to work and worked for the city on those given days."
In part, defendant's challenge to the sufficiency of the evidence presses a point that he should have made during trial: that the movie records "were not kept and checked with a degree of habit, system, regularity and continuity which would prevent casual inaccuracies and counteract the possible temptation to misstatements." State v. Perniciaro, 374 So.2d 1244, 1247 (La.1979). Counsel did not object at trial that the movie records failed to qualify under the business record exception to the hearsay rule, and "[i]n the ordinary case hearsay evidence not objected to constitutes substantive evidence." State v. Allien, 366 So.2d 1308, 1311 (La.1978). Where the state's case rests entirely on hearsay evidence, however, Allien indicates that counsel's failure to object does not necessarily foreclose inquiry into the reliability of the result. The prosecution's case in Allien turned on the prior inconsistent out-of-court statements of witnesses who recanted them at trial, and this Court held that "[t]he hearsay in this case is much too unreliable to serve as the exclusive evidence prompting the defendant's conviction simply on the strength of his failure to lodge a contemporaneous objection." Id., 366 So.2d at 1311.
The circumstances of this case dictate a similar conclusion. In affirming the *850 defendant's conviction, the Fourth Circuit observed that "[t]he jury's verdict of guilty shows that it must have believed the records from the NOPD and the movie accurately reflected the situation, and thus they believed defendant was working on the movie detail while he was supposed to be on duty." State v. Lubrano, supra, 550 So.2d at 1288. We think, however, that the jury could rationally view the movie records no more favorably than the state's own witnesses, who testified that the time cards were reliable only with regard to the number of hours of police work they reflected. No witness even ventured an opinion at trial that defendant had worked the hours reflected on the movie time card, let alone that he had worked them on the days in question. By contrast, Officer Alesich, a state witness, was satisfied that the police records showed that the defendant "was performing his duties while he was working." John Cromwell, a Louisiana State Trooper who was in charge of the roll book on several of the days in question, also testified that he was satisfied that the defendant was in uniform walking his beat on these days.
The due process standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the jury. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). Nevertheless, "`the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.'" State v. Mussall, 523 So.2d 1305, 1311 (La.1988) [quoting 2 C. Wright, Federal Practice & Procedure, Criminal 2d § 467 (2d ed. 1982)]. While the state's case invited the jury to speculate on defendant's guilt, we think that a rational, pro-prosecution trier of fact would necessarily entertain a reasonable doubt as to the reliability of the movie time cards. With no other independent evidence indicating that the defendant's particular time cards were in fact accurate, a rational fact-finder could not reasonably reject the possibility that the defendant worked those hours on different days or that he simply took advantage of the chaotic conditions on the movie set to claim hours that he actually spent walking his beat in the French Quarter.
Accordingly, defendant's convictions and sentences are reversed and he is ordered discharged.
CONVICTIONS AND SENTENCES REVERSED: DEFENDANT DISCHARGED