# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-766

**STATE OF LOUISIANA**

**VERSUS**

**JAMAAL COLE DIGGS**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 52493-T
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, J. David Painter, and Shannon J. Gremillion, Judges.

**CONVICTION AND SENTENCE AFFIRMED.**

 Michael Harson, District Attorney
Ted L. Ayo, Assistant District Attorney
Fifteenth Judicial District Court
P.O. Box 3306
Lafayette, LA 70502-3306
(337) 232-5170
COUNSEL FOR APPELLEE:
     State of Louisiana

Edward John Marquet
Louisiana Appellate Project
Post Office Box 53733
Lafayette, LA 70505-3733
(337) 237-6841
COUNSEL FOR DEFENDANT/APPELLANT:
     Jamaal Cole Diggs

**GREMILLION, Judge.**

Three eyewitnesses, a shop keeper, a man in his carport, and a teenager playing basketball, all testified that Defendant, Jamaal Cole Diggs, shot D'Jacqney W. Mitchell in the face. Immediately thereafter, Defendant killed Mr. Mitchell as he lay on the ground by firing three more shots in his neck and chest. A grand jury indicted Defendant for the second degree murder of Mitchell, a violation of La.R.S. 14:30.1(A)(1).

A jury found Defendant guilty as charged, and the trial court sentenced him to life in prison without benefit of parole, probation, or suspension of sentence. Defendant filed a motion to reconsider his sentence arguing the trial court should have a hearing to determine if his life sentence was unconstitutional. He also filed a motion for new trial arguing that the evidence was insufficient to prove his guilt beyond a reasonable doubt. The trial court denied both motions.

Defendant now appeals his conviction and sentence. He argues that the evidence was insufficient to convict him, and that his automatic life sentence is unconstitutional. For the following reasons, Defendant's conviction and sentence are affirmed.

## FACTS

Stan Suire, lead detective of the Abbeville Police Department, was walking to his vehicle on December 10, 2009, when he heard a radio report of shots being fired on Dutel Street. He went to the location and found "a lot of chaos, a lot of people running around." He spoke to Morris "Poop" Wright, the closest witness at the time, who was visibly upset because he witnessed the incident and knew the victim very well. Mr. Wright described the shooter "as a thin male with – with the haircut, hairdo, and he did mention that it was the driver of a purple car, which is a

car that is one of a kind in Abbeville, and it was one of Mary Lou's kids, Mary Lou Diggs."

Mr. Wright told Detective Suire that the suspect wore a red "skin cap." He described the suspect in his first statement as a short black male, thin build, with dreadlocks. Booking information showed that Defendant is six feet tall. His brother, Jerion "Booby" Diggs, is about five feet, six inches tall; and on April 11, 2011, the date of the photograph submitted into evidence, Jerion weighed 190 pounds. Mr. Wright's first statement indicated that he later learned the shooter was "Cooby," Defendant's street name. Other witnesses told Mr. Wright that Defendant was the shooter.

Detective Suire testified that driver's licenses of individuals other than Defendant were found inside the purple vehicle in which the shooter fled the scene. Defendant was the owner of the purple car. Detective Suire found four nine-millimeter casings near the body. No weapon was ever found.

Keyshawn Henderson was an eyewitness to the shooting death of the victim, his cousin. He was fourteen years old at the time of trial. He and his brother were playing basketball at their grandmother's house on Dutel Street when they saw Defendant in a purple-blue car. Mr. Henderson saw Defendant approach the victim when he got out of the car, then the victim "was on the ground," and Defendant was standing beside him. Mr. Henderson identified Defendant at trial.

Mr. Wright testified that he was a part-time barber at the time of this incident. The victim was in the neighborhood and asked Mr. Wright for a haircut. Mr. Wright's "shop" was an extra room in his mobile home with a window looking out onto the street that allowed him to see people coming and going.

The victim returned in a vehicle and "walked across to [Defendant's] automobile, and he stood up, put his arm – by him being tall, he put his left arm up on top the car." Mr. Wright identified Defendant as the shooter at trial. Mr. Wright turned away, then looked back. He heard a shot, looked out the window, and saw the victim fall to the ground. That first shot hit the victim in the face. Defendant "swung his door open, he come [sic] around, and he stood over [the victim] and shot him three more times." Of these three shots, one hit the victim in the neck, and two hit him in the chest. Mr. Wright told his wife to call 911 and went outside. He explained Defendant "was standing in front of – on the side of his car with the door open. When I come – came to the front part of my trailer, he looked at me, he looked at his gun, through [sic] the gun in the car, jumped in his car, and took off." The car was purple. The victim had a weak pulse; he did not respond when Mr. Wright tried to raise him so he could try to breathe.

On cross-examination, Mr. Wright testified that he did not know who was behind the wheel of the purple car at the time it arrived. He had previously seen the car in the neighborhood. When asked if he had seen anyone other than Defendant drive the vehicle in the past, Mr. Wright responded, "I guess so." He stated that he "didn't know [Defendant] by face and by name, but [he] knew [Defendant] was driving that car." He could not see the person behind the wheel when the victim approached the vehicle and rested his arm on top of it. Mr. Wright knew Defendant's mother, and he knew she had at least two sons, whom he knew as "Jeremy" and "Boogie."

However, when Mr. Wright observed the firing of the gun, he had a front view of the shooter; the victim's back was to him. He gave two statements to police, one right after the shooting and another at the police station. The same day

as the shooting, someone told him the shooter was "Cooby." He recognized Defendant from a picture on television. Mr. Wright described the shooter in his first statement as a short black male and estimated his height at trial to be five foot nine. When Mr. Wright went to the police station, Detective Suire presented Mr. Wright with three photos from which Mr. Wright identified Defendant. At trial, he had no doubt Defendant was the individual who shot the victim.

Calvin Boudreaux was on the carport of his home, looking down Dutel Street, across the railroad track from Mr. Wright's home when he saw a purple car stop in front of Mr. Wright's trailer. He saw the driver get out, and he saw the victim go talk to him. The victim made some hand gestures, and the driver shot him. The driver then shot the victim three or four times while he was on the ground before he got in the car and left. Mr. Boudreaux knew "it was the little Diggs boy," and he believed he was called "Booby." However, he was sure the shooter was Defendant because "[he] was looking at him." Mr. Boudreaux then identified Defendant as the shooter. Mr. Boudreaux gave two statements to police. He did not notice the shooter wearing a red "skin cap," but he said the shooter was taller than Mr. Wright, who was five feet, nine inches tall. Mr. Boudreaux had no doubt Defendant was the shooter and that it was not Defendant's brother, Jerion Diggs.

Lieutenant Jason Hebert of the Abbeville Police Department testified that he became aware that Mr. Wright knew the identity of the shooter when he first spoke to him. Mr. Wright knew the individual, but he did not know his name. Others told Mr. Wright the name later. Lieutenant Hebert testified that nothing was found in the purple car to tie it directly to the shooting. When Lieutenant Hebert saw the purple car, he knew it belonged to Defendant.

4

Dr. Joel Carney performed the autopsy of the victim on December 14, 2009. The cause of death was multiple gunshot wounds, and the manner of death was a homicide. The first entrance wound was at the front of the base of the neck on the right side; the shot had been fired at close range. The second wound was on the back of the left neck, slightly behind the left ear. This was a distant-range gunshot wound. The projectile was recovered from tissue surrounding the right eye. The third wound was to the left anterior chest. The fourth wound was to the posterior left hip. Both the third and fourth wounds were distant-range wounds. Two of the wounds were immediately life-threatening; one bullet passed through the heart, and another disrupted blood vessels in the base of the neck.

Christopher Henderson of the Acadiana Criminalistics Laboratory qualified as a firearm expert at trial. Abbeville Police submitted four nine-millimeter caliber cartridge cases and six nine-millimeter caliber bullets for analysis. All of the cases and bullets were fired from a single firearm, but no firearm was recovered in this case.

## SUFFICIENCY OF THE EVIDENCE

Defendant alleges that the evidence at trial was contradictory, inconsistent, and tainted. Therefore, it was legally insufficient to establish his guilt beyond a reasonable doubt. We disagree.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*,

5

448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27).

In this instance, "[s]econd degree murder is the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1. Defendant contends that the evidence was insufficient to prove the elements of second degree murder because Mr. Wright's description of the shooter in his first statement as a "short black male" did not match the description of the six-feet-tall Defendant. He complains that Mr. Wright never identified him as the shooter until others told him the shooter was "Cooby." Further, Defendant argues that Mr. Boudreaux, likewise, did not identify Defendant by name as the shooter until a few days later.

6

Defendant's arguments lack merit. Mr. Wright did not initially identify Defendant by name, and he incorrectly believed the names of Ms. Diggs's sons were "Jeremy and "Boogie." He thought the shooter was about his height, which he testified was five feet, nine inches. However, he looked at Defendant in the courtroom at trial and said he was the man he saw shoot the victim. When he saw Defendant's picture on television, he recognized him. He had no doubt in his mind that Defendant was Mitchell's murderer.

Mr. Boudreaux knew the shooter simply as "one of the Diggs boys." He did not describe the shooter as "short," as Mr. Wright did; he testified the shooter was taller than Mr. Wright. Mr. Boudreaux, like Mr. Wright, had no doubt Defendant was the shooter. A third eyewitness, Mr. Henderson, also identified Defendant as the shooter at trial.

The jury obviously found the testimony of three eyewitnesses to be credible. We agree with the jury's findings.

## LIFE IMPRISONMENT

Defendant contends that he should not be automatically imprisoned for life without the chance or opportunity to ever be released without a meaningful and particularized evaluation of an appropriate sentence in view of *State v. Dorthey*, 623 So.2d 1276 (La.1993), which dealt with the mandatory sentencing required by our habitual offender laws.

A conviction for second degree murder leads to a mandatory life sentence at hard labor without benefit of parole, probation, or suspension of benefits. La.R.S. 14:30.1(B).

To justify a court's downward departure from a legislatively mandated sentence, a defendant must show he "is exceptional . . . because of unusual circumstances [he] is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." *State v. Johnson*, 97-1906, p. 8 (La. 3/4/98), 709 So.2d 672, 676 (quoting Judge Plotkin's concurring opinion in *State v. Young*, 94-1636, pp. 5-6 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 531, *writ denied,* 95-3010 (La. 3/22/96), 669 So.2d 1223).

Here, there is nothing "exceptional" about Defendant other than the brutality and intentionality with which he took a human life. He is not a "victim." D'Jacqney W. Mitchell is a "victim." Whether Defendant's sentence was "tailored" for him, this court finds every reason to conclude that the punishment fits the crime.

## DECREE

Defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED**.