# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-268 consolidated with 18-665

**STATE OF LOUISIANA**

**VERSUS**

**LADRAY BIAS, JR.**

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 17115-16
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**********

**JOHN D. SAUNDERS**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and
D. Kent Savoie, Judges.

**AFFIRMED.**

**John F. DeRosier**
**District Attorney**
**Fourteenth Judicial District Court**
**Daniel Vermaelen**
**Elizabeth B. Hollins**
**Assistant District Attorneys**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Ladray Bias, Jr.**

**Ladray Bias, Jr.**
**General Delivery**
**Louisiana State Penitentiary**
**Angola, LA 70712**
**PRO SE DEFENDANT:**
     **Ladray Bias, Jr.**

**SAUNDERS, Judge.**

Defendant, Ladray Bias, Jr., was charged with the attempted second degree murder of the victim, Brittany Dionne Watson, in violation of La.R.S. 14:27 and 14:30.1, on September 8, 2016. He was found guilty as charged on June 15, 2017. The trial court sentenced him to serve forty years at hard labor with credit for time served. Defendant filed a motion to reconsider his sentence, and the trial court denied it on September 11, 2017.

On June 26, 2017, the State charged Defendant as a third felony offender pursuant to La.R.S. 15:529.1. The trial court vacated Defendant's sentence on November 29, 2017, and resentenced him to serve seventy years at hard labor without benefit of probation, parole, or suspension of sentence. Defendant filed a motion to reconsider his habitual offender sentence, contending the original forty-year sentence was appropriate. The trial judge denied the motion on December 13, 2017. Defendant now seeks review of his conviction and sentence. We will address Defendant's first assignment of error, alleging insufficient evidence for a conviction, in this opinion. We will address the second assignment of error, alleging an excessive sentence, in our opinion under docket number 18-665, the appeal taken after Defendant's habitual offender adjudication and resentencing.

**FACTS:**

Defendant stabbed the victim four times in her head, neck, chest, and back during an argument on July 29, 2016.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

**ASSIGNMENT OF ERROR NUMBER ONE:**

Defendant contends the evidence at trial was insufficient to convict him of attempted second degree murder. The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court

2

must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

Our supreme court has provided, "It is the intent to commit the crime, not the possibility of success, that determines whether the act or omission constitutes the crime of attempt." *State v. Smith*, 94-3116, p. 3 (La. 10/16/95), 661 So.2d 442, 444.

Further, La.R.S. 14:30.1 states:

A. Second degree murder is the killing of a human being:

(1) When the offender has the specific intent to kill or to inflict great bodily harm[.]

In *State v. George*, 09–143, pp. 4–5 (La.App. 3 Cir. 10/7/09), 19 So.3d 614, 618, the court explained, in pertinent part:

The essential elements of the crime of attempted second degree murder are a specific intent to kill the victim and the commission of an overt act that tends toward the accomplishment of the victim's death. La.R.S. 14:30.1; *State v. Hollingsworth*, 42,317 (La.App. 2 Cir. 8/15/07), 962 So.2d 1183.

Further, our court has explained:

Reading the pertinent parts of these articles together, the state in this case had the burden of proving that the defendant had the specific intent to kill and did an act for the purpose of and tending directly toward accomplishing it. *State v. Butler*, 322 So.2d 189 (La.1975); *State v. Guin*, 444 So.2d 625 (La.App. 3 Cir.1983). Specific criminal intent has been statutorily defined as the state of mind which exists when circumstances indicate

that the offender actively desired the proscribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). Since specific intent is a state of mind, it need not be proven as a fact, but rather may be inferred from the circumstances and the actions of the defendant. *State v. Graham*, 420 So.2d 1126 (La.1982).

*State v. Hongo*, 625 So.2d 610, 613 (La.App. 3 Cir. 1993), *writ denied*, 631 So.2d 1163 (La.1994).

*State v. Williams*, 16-579, pp. 7-8 (La.App. 3 Cir. 4/5/17), 216 So.3d 107, 112-13.

Officer Chris Baudin of the Lake Charles Police Department answered a call about a disturbance at 2001 North Lincoln Street around 11:09 p.m. on July 28, 2016. The victim "was intoxicated and she was pretty emotional, talking about [how] her and her boyfriend got into a fight. He threw some glass at a car, but [Officer Baudin] didn't observe any marks on her that would have indicated any kind of physical altercation." He further described the victim as angry and belligerent.

During Officer Baudin's second encounter with the victim that evening, she told him her boyfriend had returned and caused another disturbance. However, by the time she called the police, he had "left in his vehicle and was just driving around the location." Officer Baudin observed no marks on the victim, who was still intoxicated, angry, and belligerent, and, according to Officer Baudin, she was not making sense.

Officer Baudin was called to the location a third time that night regarding a report of a stabbing. Other officers already at the scene described the suspect and his vehicle. Officer Baudin "knew who it was off the description." He searched the area and located Defendant's vehicle with fresh blood on the interior.

Around 2:50 a.m. on July 29, 2016, Officer Caleb Young, a patrol officer with the Lake Charles Police Department, also received a call about the incident at 2001 North Lincoln Street. When he and another officer arrived, they found the victim, who appeared to have been stabbed, sitting in a chair. The victim "was hysterical.

4

She was scared. She was screaming. . . . She [] said, 'He stabbed me,' and she was stating that she was going to die. She kept going in and out of consciousness."

A drawer where knives were kept was open in the kitchen. Officer Young found a knife in the yard outside the south entrance of the residence with no dew on it, indicating to him it had not "been there long." He also saw drops of blood on the floor from the north bedroom of the house to the chair in the living room where the victim was seated when he arrived.

Detective Hope Sanders of the Lake Charles Police Department investigated the stabbing incident. She interviewed Defendant on the day of the stabbing, and he had an injury to the palm of his right hand. After speaking with the witnesses and seeing the collected evidence, she issued an arrest warrant for Defendant for attempted second degree murder.

Phillip "Toby" Harrison was living at the residence at the time of the incident with his cousin, Phillip "Pepper" Harrison.[1] He was asleep when Ms. Coco Landry, another resident of the address, woke him and "said an incident had happened in the house and [he] needed to come see." He saw the victim with "a little cut on her head and stuff," but he did not know what happened. He got a towel for the victim, wrapped her head, and told her to stay awake. Toby, Ms. Landry, the victim, and "Peanut," another resident of the house, were present.

The victim said she was hurt and thought she was dying. Toby said he told her, "'You ain't [sic] dying. It ain't [sic] that bad.'" She did say "her [sic] and Junior had got [sic] into it[,]" and "she said Junior had cut her." Toby identified "Junior" as Defendant, his friend.

---

[1]Because two residents of the house were named Phillip Harrison, we will refer to them by their nicknames, Toby and Pepper.

Coco Landry lived at the residence with six others: Toby, Peanut, Darrell, Pepper, Constance (Darrell's girlfriend), and Little Ricky (Ms. Landry's "ex"). The victim sometimes came to the house to visit Ms. Landry as she was doing at the time of the incident. Ms. Landry said Defendant and the victim knew each other, but she did not think they had ever had a relationship as a couple.

Ms. Landry testified Defendant stabbed the victim, and she identified him at trial. Around midnight on the night of the incident, she and someone named "Hooch" asked Defendant to take them to the store to get beer.[2] When they returned to the house, Ms. Landry saw a car there she knew belonged to the victim. Defendant walked "up to the house yelling, 'I don't want that bitch inside our family house. This is our house. Why is she over here? Why is she following me like this? I asked her not to come around me when I'm over here,' and this and that." As Ms. Landry helped "Hooch" exit their vehicle, she heard a beer bottle fall, and she "knew [Defendant] had done threw [sic] it probably at the back glass of the victim's car." Defendant and the victim were arguing as they came out the front door. After Defendant again told the victim to leave, he got in his vehicle and left. Ms. Landry did not know what had transpired inside the house, but she had heard both of them hollering "back and forth[.]"

Ms. Landry saw the victim when she went inside, and the victim had "a fist print [on] her face." Police were called, and the victim explained Defendant had thrown the beer bottle. Police took Defendant's name and a description of the clothes he wore. They told the women to call if anything else happened. Ms. Landry gave the victim a towel with some ice in it to put on her jaw. She had one beer, and the victim had one drink as they visited.

_____

[2]The record does not explicitly identify "Hooch."

Their friend Jeremy Bias arrived, and Defendant called for him on the house phone. Mr. Bias went outside, and Ms. Landry returned to the table and her conversation with the victim. About five minutes later, Mr. Bias and Defendant came into the house. Defendant was on the phone with his father, and he said to the victim, "'Bitch, why you got [sic] your baby daddy calling my daddy [sic] house phone at this time of the night?'" Ms. Landry told him the victim had been there talking to her, and she had not been on the phone. The victim told Defendant she did not use the phone; Defendant called her a liar.

Defendant hung up the phone and walked toward the kitchen. Ms. Landry heard a drawer open, and she heard Mr. Bias and Little Ricky, who were standing in the kitchen, "telling [Defendant], 'No.'" She tried to signal the victim to go through the house where she could get out the front door. Defendant grabbed a knife and moved into the corner of the living room where the victim stood. He held the knife "upward in his hands[,]" as in overhead stabbing, with the blade pointed to the ground. Ms. Landry testified:

> He was saying, "I'm gonna [sic] kill you, Bitch. I'm gonna [sic] kill you." And I knew something was fixing to happen. So, I was trying to signal her to go to the back room out through the front door, the actual front door. And, before I could even turn around he was stabbing her, and the guys were trying to fight him, and I was pulling his shirt telling him, "No. Don't do that."

The victim went down onto the floor after the first stab. The second stab was to her head as she was on the floor. Mr. Bias and Little Ricky tried to grab Defendant to make him release the knife and leave. Defendant took off his shirt as Ms. Landry pulled on it, and he left it by the door. Ms. Landry thought Defendant "just got tired and he walked outside." Defendant dropped the knife in the yard as he exited the side door. Ms. Landry identified the knife shown in State's Exhibit 26 as the knife Defendant used to stab the victim.

7

Ms. Landry got towels for the victim to try to stop her bleeding, and she threw ice water on the victim to keep her awake while she called an ambulance and the police. Only Ms. Landry, Toby, Peanut, and the victim remained in the house; everyone else had left. Ms. Landry woke Toby, who was asleep in his bedroom, and told him, "He's stabbing her."

Joseph "Peanut" Offord also lived at the house on Lincoln Street when the victim was stabbed; he was in a nursing home at the time of trial. He was lying on the couch when Defendant "came in fussing and all that, and then he went in the house and got a knife out of the kitchen drawer and said he was going to kill her[.]" Defendant said "something about . . . they had called his daddy[,]" and "[h]e said he could kill her[.]" Mr. Offord first testified he saw Defendant stab the victim. However, when asked if he could see into the kitchen, Mr. Offord responded, "No, not that good [sic]." He thought the victim was in the kitchen. Defendant and the victim were hollering at each other. Mr. Offord did not see the victim hit Defendant.

Jeremy Bias, Defendant's cousin, worked as a chef at the time of this incident. He testified he had been at the house on North Lincoln since the day before, and Defendant came to meet him there. Mr. Bias cooked that day, and he and Defendant went to the store twice to get some beer. Everyone was drinking.

The victim was at the house the second time they returned. After a while, she and Defendant began to argue. Mr. Bias had used a knife while he was cooking, and it was still on the kitchen counter. He said he was "messing with [his] phone"; when he looked up, the victim and Defendant were "already tussling." He did not know who grabbed the knife. He could not say whether he ever saw it in the victim's hands. He did see Defendant holding the knife during the incident, but he did not know "if he took it from [the victim] or what[.]"

8

The victim, Brittany Watson, testified she and Defendant started dating in June or July of 2015. They broke up around the end of May or the beginning of June 2016, approximately six weeks to two months before this incident. During that time, Defendant tried to get back together with the victim. The victim said Defendant "was a jealous type." After they broke up, Defendant would call her phone, but she would not talk to him.

On July 29, 2016, the victim said she went to the house on North Lincoln around 1:00 a.m., and Defendant saw her car there. When she arrived, Ms. Landry, Mr. Offord, Toby, and Ricky were present. The victim and Ms. Landry cooked spaghetti and sat at the kitchen table to eat.

Defendant came by the house three times according to the victim. The first time, he brought Hooch to the house. He saw the victim outside and threw a beer bottle at her car, but the bottle did not hit it. The victim went inside and called the police because she "felt threatened." When Defendant came to the house the second time – the victim thought he came to get Hooch – he hit the victim in the face, and she "kind of . . . threw a lick back." Defendant was yelling at her, "'I'm gonna [sic] kill you bitch. You stupid, stupid bitch. What you doing? What you doing at my people's house? Get away from here,' stuff like that. Everything was, 'bitch, bitch, bitch.'" She told him to stop and to get away from her. Defendant punched her "a couple of times[,]" and the victim hit him "[m]aybe once or twice." The victim called the police again and said Defendant had hit her.

When Defendant came back the third time, the victim testified she and Ms. Landry were sitting at the kitchen table. Defendant "barged in, busted in the door." He ran to the kitchen and grabbed a knife from a drawer, yelling continually that he was going to kill her, calling her a "bitch and ho." He kept saying, "'I'm gonna [sic] kill this bitch. I'm sick of you. You gonna [sic] die ho[.]'" The victim ran through

9

the kitchen and living room, and Defendant caught her. She testified she felt "[l]ike I – I – I was losing my life, like I was about to die." She thought he was about to kill her.

Defendant stabbed the victim one time in the neck as she stood, before she got through the living room. The victim screamed, and Defendant said, "'Bitch you gonna [sic] die" before he stabbed her in her chest. Defendant stabbed her a third time in her head or her back. She thought she was standing all four times as Defendant stabbed her from overhead and as he kept saying, "'Bitch I'm gonna [sic] kill you.'"

After Defendant stabbed the victim four times, she said he ran out of the house. The victim went in and out of consciousness as Ms. Landry wrapped a towel around her wounds. Someone called 911, and emergency medical personnel and the police came. The victim spent half a day in the hospital. The wound to her head required three staples. She also denied ever holding the knife or using it against Defendant.

While Defendant was incarcerated after the incident, the victim said he called and asked her to sign an affidavit dropping the charges against him. At one time she told him she would, but she did not do it. He called her other times from jail, saying he loved her and one time saying he was sorry. He called the victim another time from jail, about six weeks prior to trial, and she talked to him at his mother's request. The victim told him during that call that she would sign a paper to drop the charges against him. Defendant's mother also asked the victim not to testify against him; she told the victim Defendant was sorry for what he had done.

Defendant also testified at trial. He said he had known the victim his entire life; they were raised together. In fact, their fathers were cousins. Defendant and

the victim became romantically involved around July 2015. He described the victim as "a little violent."

On the night of the stabbing, Defendant went to the house on North Lincoln around 11:30 p.m. He said he went there "all the time to sit down and watch the football game or basketball game and drink." He left to go to the store and saw the victim there. He told her to come see him later. They were not really dating at the time because they were cousins, but she wanted to marry him.

The victim was at the house after Defendant went back a second time. She and Defendant argued about why he had not called her; he had "backed away" because she broke his window and kicked his car. Defendant denied he threw a beer bottle at the victim's car; he said he threw a bottle toward an open trash can and missed. He left the house then, but he returned a third time because the victim "kept calling [him] all night." She asked him to come back to the house, and he agreed.

The victim was sitting in the kitchen when he arrived. Defendant testified, "And then she just flashed out like it was like a setup. She just flashed out on me." Defendant said the victim was angry and yelling at him. She had learned he had been talking to Melissa Fontenot, whom the victim considered an enemy.

During the argument, Defendant said the victim grabbed a knife. She, Ms. Landry, and Mr. Bias were in the kitchen, and Defendant was standing by a china cabinet next to the side door. He said he "never made it into the kitchen." Defendant testified, "She come [sic] at me with it. So, I started wrestling with her." He grabbed the knife from the victim, ran outside, and threw the knife. The victim came outside running at him. He was cut on his right hand and "was bleeding bad." He ran to his car and left. He had no time to wipe the knife.

Defendant said the victim, Ms. Landry, Mr. Bias, and Mr. Offord were all lying when they said he grabbed the knife; he testified, "They must have seen when

I grabbed the knife from her." He insisted they were "telling it wrong" by saying he grabbed the knife, swung it, and said he would kill the victim. They could only have seen Defendant and the victim "tussling." Defendant repeatedly testified he wrestled with the victim, but he did not stab her. They were both holding the knife when the victim's wounds were inflicted. When asked how the victim sustained a stab wound to her back, Defendant explained, "Because we was [sic] wrestling, and when I grabbed the knife, it slipped like. We was [sic] wrestling like that. That's a big girl, and she was just wrestling." Defendant also said the victim "was real drunk." He said the victim was not on the ground, and she "got stabbed in the wrestling." Ms. Landry "probably was in the back[,]" in the bathroom, when the victim came at him.

Defendant testified he went to his mother's house after the incident. The victim told him she pressed charges against him because she thought he would press charges against her. He "didn't even know she had no [sic] little scratches or nothing [sic] until they put a warrant out" for him. He had no intent to harm or kill the victim. He testified, "That's my cousin. I love her."

The victim kept telling Defendant's mother she would sign an affidavit. Defendant admitted he told the victim during his call to her from jail that he loved her, and he asked her not to come to court and to sign the affidavit dropping the charges. Nevertheless, he denied trying to talk her into not testifying against him. He said the victim was talking about not coming to court before he spoke of it. Defendant also told the victim during the call that he was going to marry her, even though he testified he would not marry her because she was his second cousin. Defendant admitted to having a sexual relationship with the victim, but he described it as, "we was [sic] talking, and we was just like sleeping around. We wasn't [sic] boyfriend and girlfriend." The victim at one point was carrying Defendant's baby,

12

but she had a miscarriage. Defendant testified, "I said I wouldn't marry her because she's my second cousin, but I will marry her."

Christopher Singletary, a forensic DNA analyst at the Southwest Louisiana Crime Lab, qualified as an expert in the field of forensic DNA analysis at trial. He examined a knife submitted to him and found suspected blood on it. However, his testing failed to demonstrate the presence of blood.

Mr. Singletary examined the knife, two swabs containing possible blood, and buccal swabs from the victim and Defendant for DNA. He found DNA from one major contributor and from one partial minor contributor on the handle of the knife. The major contributor's DNA matched Defendant's reference buccal swab. The minor contributor's DNA contained an insufficient amount of information to compare. Swabs from blood stains from the driver's seat of Defendant's vehicle also contained DNA that matched Defendant's reference sample. Mr. Singletary could not say how long the stains had been on the seat. None of the DNA from the knife or the swabs matched the victim. Mr. Singletary found no blood on the knife and none of the victim's blood on the swabs taken from Defendant's vehicle.

The stabbing incident was not the first altercation between the victim and Defendant. The victim testified she was dating Defendant in November 2015. They were riding in his car together, leaving a store, when she told him she "didn't want to be with him no [sic] more." They stopped at a convenience store, and she got of the car to walk home. Defendant began chasing her in his car as she ran through yards and tried to hide. When he caught her, he got a crowbar out of the trunk of the car and began beating her in the back of the head as she lay on the ground. Defendant dragged the victim by the hair and put her in the trunk of the car. She thought he was going to kill her.

The victim testified Defendant took her to his mother's house. As she "was playing possum[,]" she heard him say, "'I killed the bitch'" to his mother. When Defendant took the victim out of the trunk, he saw her finger move, and he started kicking and punching her in the head. Defendant's mother started screaming, and his father came outside and helped the victim, whom Defendant had left on the front porch. The State introduced a photograph of blood on the ground at Defendant's parents' house. Other photographs showed the victim at the hospital wearing a neck brace with blood on her face and head. Although the victim pressed charges against Defendant, she "didn't finish[.]"

The victim admitted she was previously involved in a knife fight with another woman, Melissa Fontenot. At trial, Defendant's counsel questioned the victim about whether the purported crowbar incident actually involved injuries from the knife fight with Ms. Fontenot. She denied telling Defendant's mother she had been in a fight and ran to the house for help.

Officer Christopher Breland testified at trial about the prior incident with the victim and Defendant. Officer Breland answered a call to 2125 Knapp Street "involving a black female that was basically screaming for help and needed an ambulance and was injured." The homeowner, Linda Bias, told him "[s]he heard screaming coming outside of her front door." She found the victim, bleeding and asking for help. When Ms. Bias asked the victim what had happened, "all she could say or state repeatedly was, 'Junior.'" Ms. Bias identified "Junior" as Defendant, her son.

Officer Breland spoke to the victim, who "was banged up" and "had some obvious severe injuries," at the hospital. The victim told him she and Defendant were in a car together arguing, and he threatened her. She decided to exit the vehicle and run. Defendant stopped the vehicle, exited it, and grabbed something from the

14

trunk. He chased and caught her, hit her over the head with the object, and rendered her unconscious. When she regained consciousness, she was "back inside the vehicle[.]" Defendant took her to his mother's house, "dropped her off at the front door in the front yard and then left."

Ms. Bias gave conflicting testimony about the day in November 2015 when the victim came to her house "full of blood[.]" Ms. Bias testified the victim said she had been fighting with some girls who were beating her up at a store on Simmons Street. The victim went to Ms. Bias's home because she thought Defendant was there. When Defendant told the victim to "'[j]ust leave it alone[,]" she became angry and took a crowbar out of the trunk of Defendant's car while Defendant tried to stop her. She used the crowbar to shatter the windshield of Defendant's car.

On cross-examination, Ms. Bias testified she called 911 and said the victim was outside her house, crying for help, lying on the ground, and bleeding from her head. She did not tell 911 anything about the other girls that purportedly hurt the victim. Ms. Bias testified she told the officers who responded to the call about those girls. She thought Defendant was present when the ambulance arrived, but she also said she did not remember. She further testified she told police she did not know where Defendant was because she "didn't know if he left to go see where the girls was [sic] to see what happened" to the victim.

Defendant testified he never hit the victim in the head with a crowbar, and he did not know what happened when the victim ended up at his mother's house. He did go looking for the girls he was told were fighting the victim "to see what was going on." The victim broke a window in his car that night. She was "always busting [his] windows all the time."

The only testimony in the record about the victim being the aggressor during the stabbing on July 29, 2016, came from Defendant himself. Police officers

15

testified the victim identified Defendant as her attacker. Toby Harrison testified the victim identified Defendant as her attacker. Coco Landry, an eyewitness, testified Defendant struck the victim earlier in the evening and then stabbed her without provocation. Peanut Offord thought Defendant stabbed the victim. None of these witnesses testified about the victim and Defendant tussling or wrestling when the victim was wounded. Additionally, Ms. Landry and the victim testified Defendant clearly stated his intent to kill her. Peanut Offord testified Defendant got the knife from the drawer and said he was going to kill the victim.

The victim suffered four stab wounds in her head, neck, back, and chest. Defendant's brief argues the victim was injured while she wrestled with him over the knife. Defendant also contends the victim's wounds "were superficial and non-life threatening[,]" and she only stayed in the hospital for half a day. She required only three staples to the stab wound in her head. Defendant argues the knife recovered from the scene "could have inflicted serious injuries if that was [Defendant's] intent." Thus, he suggests the evidence shows only his general intent to commit an aggravated battery on the victim. He did not make that contention in his motion to reconsider his sentence.

Credibility determinations are functions of the jury. *Ryan*, 969 So.2d 1268. "Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun." *State v. Washington*, 50,424, p. 6 (La.App. 2 Cir. 3/16/16), 188 So.3d 350, 356, *writ denied,* 16-718 (La. 4/13/17), 218 So.3d 119.

The jury could have reasonably found the testimony of the witnesses who said Defendant took the knife, told the victim he was going to kill her, and stabbed her four times to be credible. Accordingly, we find that the evidence is sufficient to establish the elements of attempted second degree murder, and Defendant's conviction is affirmed.

16

## **ASSIGNMENT OF ERROR NUMBER TWO:**

Defendant alleges his seventy-year sentence is excessive. Because that sentenced was imposed pursuant to Defendant's habitual offender adjudication, we will address the issue in docket number 18-665, the appeal of the habitual offender proceeding.

## **DECREE:**

Defendant's conviction for attempted second degree murder is affirmed.

**AFFIRMED.**