NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-1171

STATE OF LOUISIANA

VERSUS

LANTIBIOUS A. BROUSSARD

AKA LANTIPIOUS A. BROUSSARD

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR132472
HONORABLE KRISTIAN DENNIS EARLES, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

BILLY HOWARD EZELL
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Jimmie C. Peters, and Billy Howard Ezell, Judges.

CONVICTIONS AND SENTENCES AFFIRMED.

**Michael Harson**
**District Attorney**
**Fifteenth Judicial District Court**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Edward Kelly Bauman**
**La Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Lantibious A. Broussard**

**Mark T. Garber**
**Attorney at Law**
**2000 W. Congress Street**
**Lafayette, LA 70506**
**(337) 234-5500**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**EZELL, Judge.**

Defendant, Lantibious A. Broussard, was charged with attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1, illegal possession of a firearm as a convicted felon, a violation of La.R.S. 14:95.1, and illegal possession of a stolen firearm, a violation of La.R.S. 14:69.1, on May 26, 2011.[1]  He pled not guilty to all charges on June 7, 2011.

A jury found Defendant guilty of attempted manslaughter, a violation of La.R.S. 14:27 and 14:31, and of possession of a firearm by a convicted felon as charged, on September 6, 2012.  The trial court sentenced Defendant on April 22, 2013, to the maximum term of twenty years at hard labor on attempted manslaughter and to ten years at hard labor for possession of a firearm by convicted felon, with the sentences to run consecutively.

## FACTS

On April 1, 2011, Dana Figaro and Camella Thompson were involved in a physical altercation.  During the fight, Defendant, Thompson's son, shot the victim, Figaro's boyfriend, four times.   Defendant had previously been convicted of second degree battery and was prohibited from possessing a firearm.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record.  After reviewing the record, we find there are errors patent.

## ASSIGNMENT OF ERROR NUMBER TWO

Defendant argues the evidence was insufficient to convict him because the State failed to prove beyond a reasonable doubt he had the specific intent to kill the

---

[1]The record also refers to Defendant at times as "Lantipious Broussard."

victim. We consider this assignment of error first in accordance with *State v. Hearold*, 603 So.2d 731 (La.1992).

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The fact finder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of facts[,]" but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of

2

law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378 (alteration in original).

"Manslaughter is . . . [a] homicide which would be murder . . . but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31(A)(1). "In order to obtain a conviction for attempted manslaughter, the State must prove beyond a reasonable doubt that the defendant possessed the specific intent to kill, a finding which is not necessary to support a manslaughter conviction." *State v. Dubroc*, 99-730, p. 5 (La.App. 3 Cir. 12/15/99), 755 So.2d 297, 303 (citing *State v. Porter,* 626 So.2d 476 (La.App. 3 Cir. 1993); *State v. Salone,* 605 So.2d 229 (La.App. 2 Cir. 1992)). "Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant." *State v. Maxie*, 93-2158, p. 11 (La. 4/10/95), 653 So.2d 526, 532 (citing *State v. Graham,* 420 So.2d 1126 (La.1982)). In a non-homicide case, the defendant bears the burden of proving self-defense by a preponderance of the evidence; he must show the force used was objectively

reasonable under the circumstances and subjectively apparently necessary. *State v. Baker*, 08-54 (La.App. 3 Cir. 5/7/08), 986 So.2d 682; *State v. Perkins*, 527 So.2d 48 (La.App. 3 Cir. 1988). The same test applies when a defendant alleges he acted in defense of others. *See State v. Nailor*, 10-1062 (La.App. 5 Cir. 11/15/11), 78 So.3d 816, *writ denied,* 11-2780 (La. 4/27/12), 86 So.3d 626.

In *Dubroc*, 755 So.2d 297, the former boyfriend and friends of the defendant's wife riddled their mobile home with gunfire after making threatening calls to the home. The defendant pursued the shooters' vehicle and exchanged gunfire with its occupants. When the vehicle stopped, the defendant "discharged his shotgun into the car, injuring two of the occupants." *Id.* at 301. He claimed the discharge was an accident that occurred during his attempt to make a citizen's arrest. Some evidence supported the defendant's claims of accidental discharge and justification, but other evidence refuted those claims. This court found the evidence was sufficient to infer the specific intent to kill an occupant of the vehicle.

The fifth circuit held the evidence established the specific intent to kill in *State v. Hidalgo*, 95-319 (La.App. 5 Cir. 1/17/96), 668 So.2d 1188. The defendant, using a laser sighting device, fired a gun directly at the fleeing victims. A witness testified the defendant did not fire into the air but rather, carefully aimed at the victims over the roof of the car. The fifth circuit affirmed the defendant's convictions for manslaughter and two counts of attempted manslaughter.

Here, Detective Brian Baumgardner of the Lafayette Police Department found "a large amount of blood . . . pretty much positioned in the middle of the road just to the left of center of the roadway near the driveway" at Thompson's home when he arrived at the scene. Officers recovered a black semi-automatic

4

handgun, a black Desert Eagle .9 millimeter pistol, near the back steps of a residence two blocks away. They also found three of five casings on the side of Thompson's yard.

About an hour before the shooting, Defendant and Figaro were involved in a verbal altercation at the H&C Store and had to be separated so the fight would not escalate into a physical altercation. When Figaro left the store, she said she was going to get her boyfriend, the victim, and go to Thompson's residence.

When they arrived, Defendant asked the victim "to take Ms. Figaro from the scene, that he didn't want this type of trouble to be going on in front of his residence." Figaro approached Thompson to start another verbal altercation that turned physical "just outside the driveway" of the residence. The victim and Figaro parked their vehicle in the street and walked approximately seventy-five feet into Thompson's yard.

Defendant and the victim watched Figaro throw a punch at Thompson, and the victim approached the two women. Defendant thought he "was going to cause some type of harm to his mother" and "told him to stay off." Detective Baumgardner said Defendant thought his mother was hurt and produced the weapon from his waistband. Defendant shot the victim in the arm and the leg, then stood over him and fired two shots "into his lower extremity as to not to kill him." Defendant then fled the scene and discarded the gun at a friend's residence, where he was taken into custody. He told Detective Baumgardner he did not intend to kill the victim. He shot the victim "[t]o stop him from approaching his mother." He was also "worried because he knew he was a convicted felon[,] and he was carrying a weapon." Nothing in Detective Baumgardner's investigation showed Defendant exhibited aggression, but he acted when his mother was under attack by

Figaro. Nevertheless, Defendant did threaten to beat up the victim during the argument with Figaro at the store.

The victim never struck Ms. Thompson. He sustained two gunshot wounds in the abdomen, one in his left leg, and one in his left arm. Some of the bullet fragments could not be removed because of their location near the pelvic area and under the rib cage. Detective Baumgardner testified the "center mass" is the best place to shoot to kill; the belly "can be" the center mass on a police target, where officers are trained to shoot. Detective Baumgardner considered this "deadly force." Officers found five casings, and nine unspent rounds were found in the gun.

Dr. Kenneth Laborde testified the victim was "in shock from blood loss" and had been intubated when he saw him in the emergency room. He was "critically ill" and "had lost about three (3) or four (4) units of blood in his abdomen." Dr. Laborde testified, based on the trajectory of two of the bullets, the victim was "shot from the back and possibly rolling around from side to side after each bullet." X-rays showed fragments of those bullets in the abdomen and soft tissue around the abdomen. Dr. Laborde said the victim was "unbelievably lucky that he wasn't paralyzed" from the shots. The victim also had a non-life-threatening wound through an arm and another, "through and through," wound on the left thigh. He stayed in the hospital from April 1 to April 8, 2011.

Detective Paul Trouard of the Lafayette City Police Department testified his report of the incident indicated Thompson said Defendant thought she was under attack by the victim. Thompson heard a gunshot and turned to see the victim "lying on the ground wounded and [Defendant] standing over him with a gun[.]" The victim was "making disrespectful comments" to Defendant, who "fired his

6

pistol two (2) additional times striking [the victim] while he was lying on the ground."

Figaro testified she and Defendant had "run-ins" for about a year prior to the day at the store. On the day of the shooting, Defendant was talking about fighting Figaro's boyfriend, the victim, while he was talking to her in the store. The argument began inside the store and continued outside; Defendant said for her to bring her boyfriend, and he would "knock him out." Although Figaro said she was not proud of her behavior, she had "really, really had enough . . . on that day."

Figaro went home, got the victim, and took him and her five-year-old son to the street where Defendant lived. The victim had previously tried to speak to Defendant "about the disrespecting [Figaro] for no apparent reason." The victim exited the car, planning to talk to Defendant. He had no weapons. During the discussion between the victim and Defendant, Thompson came out and asked Figaro "what was going on."

Thompson and Figaro stood arguing "in the middle of the street face to face" when the fight between them broke out. Figaro swung at Thompson in response to Thompson lifting her hand. Figaro recalled the victim grabbing her from behind and walking toward her car with both of the victim's hands around her and their backs turned to Thompson when she "heard a pop noise and [the victim] yelled" and fell to the ground. Defendant stood over the victim's feet and shot; Figaro testified she "heard about five (5) shots." Defendant told the victim "he could have killed him." After Defendant fired the shots, "he took off running."

The victim never approached Thompson. He and Figaro never went into Thompson's yard. The fight and the shooting occurred in "the block before [Thompson's] house . . . maybe five (5) footsteps from the car."

7

At trial, the victim testified he did not know Defendant. He said his girlfriend called him after an altercation with Defendant at the store. He "went to talk to [Defendant] to see what was going on." The victim did not intend to fight Defendant, "but if [he] had to [he] would have." He did not have a weapon. They exchanged words, and the victim asked Defendant if he wanted to fight. Defendant said he was going to get a gun from inside the house. When Figaro and Thompson began fighting, the victim grabbed Figaro so they could leave. Defendant "went in the house and came back out." The victim was not advancing toward Thompson, and he had no intention of hurting her.

After Defendant shot the victim, he stood over him, said "I could kill you," and shot him two more times. The victim believed his "belly was facing [Defendant]" when he was shot the first two times, and he understood he "could wake up any day paralyzed . . . [b]ecause something about the bullets messed up [his] spinal cord or something. And [he has] a fragment still stuck just an inch away from [his] spinal cord."

Thompson testified Defendant was protecting her when he shot the victim. She said Defendant shot the victim on the ground because the victim "looked like he was reaching behind for something[.]" She assumed Defendant shot the victim in the leg again "because he thought he had a weapon and was reaching for a weapon." However, she then added, "I really don't know." Thompson considered the victim to be a threat to her and to Defendant because he and Figaro came to her house. Defendant kept walking away from Figaro, asking her to leave, while she argued with him. After the fight broke out, Thompson said the victim "started grabbing [her], too, and pulling [her] clothes while [she] and his girlfriend [were] fighting." At that point, Defendant and the victim started fighting. Thompson

8

believed the victim "was protecting his girlfriend and trying to fight [Thompson] for his girlfriend." She thought he "probably did" hit her. She did not know Defendant had a gun. Thompson testified the entire incident was Figaro's fault.

Megan Broussard, Defendant's cousin, testified for the defense. Broussard and her mother heard people talking loudly and thought the sound came from Thompson's house. When they arrived, Figaro and Thompson were fighting, "not in the yard, yard, but by her pole on her property . . . They have a pole between both the lots . . . because the lots join together." According to Broussard, the victim "grabbed [Thompson] like he was going to hit her . . . like he was going to hold her for his girlfriend." She admitted she assumed the victim grabbed Thompson because he was going to hit her. Broussard first testified Defendant first shot the gun into the air. She then explained she said that "because the first shot was like one (1) shot. When you're shooting at somebody you're going to shoot more than one (1) time. The first shot was one (1) shot that I heard."

Broussard "took off" because she "was scared." Defendant ran the same way she ran, and she asked him why he had done that. Defendant told her Figaro and the victim had come to the house before; he "didn't mean to do it . . . but [the victim] big. He bigger than me and I'm just tired of them coming to my mama['s] house with this." Defendant also said the victim "swung at [his] mama." Broussard believed "the fight happened in the yard, in the grass," and the victim fell into the street.

Broussard testified Defendant must have had the gun on him because he did not go into the house while she was there. In her statement to police at the time of the incident, Broussard had said Defendant always carried a gun. At trial, she testified he usually carried one, but she "wouldn't say all the time."

9

Jonathan "Beanie" Paris also testified for Defendant, his cousin. He was at the H&C store that day to meet Defendant's older brother, who worked there. He heard Figaro "cussing and swearing" and Defendant "kind of giggling to hisself (sic)." After the altercation between Defendant and Figaro, Paris and Defendant walked to Defendant's house. As they were turning onto the block, the victim and his girlfriend came "flying down the street full force, kinda ready to engage in violent activities. Like they were ready."

The victim and Figaro exited the car and began talking to Defendant. Defendant told the victim he did not want to fight "a number of times." They moved into the yard, and Thompson came outside. Figaro and Thompson argued, then "punches were thrown" in the yard. The fight moved from the yard to the street, then back to the yard. Paris "proceeded to try to break them up," but the victim "was charging and he didn't look like he was coming to stop the matter. He looked like he was coming to engage in conflict." Paris said he heard the victim say, "[l]ets [sic] go," trying to get Figaro to leave. The victim then "ran from the vehicle, he was charging at the fight." He was engaged in an altercation with Thompson when he was shot. Paris never heard Defendant say he was going to get a gun. He knew two shots were fired, but after that, he did not recall how many more were fired.

Figaro and Thompson were still fighting "right at the end of the yard" when the first shots were fired. The victim was "[r]ight along with them at the edge of the yard." At some point during the incident, Defendant asked Thompson to tell Figaro and the victim to leave because he did not want to fight. Paris did not know where Defendant got the gun.

Paris testified he was thrown to the ground defending Thompson. He advanced toward Figaro when the shots were fired, and "that's where [he] blanked out." Nevertheless, Paris recalled Figaro "running around crying" after the shots were fired and the fight immediately stopped. According to Paris, "[w]hen the shots were fired [the victim] was left standing up." Paris only heard two shots, and he said the victim crawled into the street after he fell.

Defendant testified he pled guilty to second degree battery after hitting a woman who came to his house and asked him to sell drugs to her. He was on probation, prohibited from carrying a gun, at the time of this offense. Defendant and Figaro had a prior altercation at which the victim was present with a gun.

On the day of this incident, Defendant told Figaro to leave Thompson's home after she arrived with the victim. However, the victim approached him and said he wanted to fight. Defendant never said he was going inside to get a gun; rather, he tried to walk toward his house to leave.

Defendant kept a gun "underneath [the] step in [his] yard – in [his] house." He knew he was not supposed to carry a gun, but he "always had a gun just in case anything had to happen [he] would have a gun." He was protecting his family when he got the gun after he was "pretty sure [Figaro] hit [his] mama" and they began to fight. Defendant said the victim was "no where [sic] around the altercation[.]" After Thompson said Figaro had bitten her, Defendant went toward Figaro; he turned around and saw the victim approaching Thompson. The victim grabbed Thompson and had his hand on her. Defendant said "when [the victim] picked his hand up I shot him." He pulled the gun out when he saw the victim approach Thompson. He could have told the victim to get his hands off Thompson three or four times, but the victim "still didn't stop."

11

After Defendant shot the victim the first time, the victim "tried to advance towards [sic]" Defendant. With the first shot, Defendant aimed "anywhere towards the lower part of his body[.]" When the victim came towards Defendant, Defendant shot him again, firing two shots. He did not know if the victim was armed.

Defendant shot the victim while he was on the ground "either because he was reaching for a weapon or just to really have him not be able to move or retaliate[.]" While Defendant admitted trying to inflict harm on the victim, he denied he intended to kill him. Rather, "it was just to really keep him down." Defendant stopped shooting because he "really felt like that was enough, there was enough harm I inflicted on him for him not to retaliate."

Although Defendant had several chances to kill the victim, he did not; he felt "like what he was doing was right for [him] and [his] mother." He felt he was wrong for shooting the victim, "but at the same time, there was a reason behind that." He testified he "did not attempt to kill the guy. It was just to really protect the family, make sure he could not retaliate in no [sic] type of way." He "really felt anybody should understand what happened." "Probably not even a minute" passed between the first and the last shots.

During the incident, Thompson told Defendant, "Get rid of that gun. Don't do that." However, "it was like already too late. [Defendant] already got caught up in the moment . . . trying to diffuse the situation of him not inflicting any harm on [Thompson]." Defendant did not think about the consequences of the shooting. Once the victim put his hands on Thompson, "that's just enough for [Defendant] to just go off[.]" Defendant did not remember shooting the victim in the back, but he did recall shooting him once when he was on the ground. Defendant disputed Dr.

12

LaBorde's testimony that the victim was shot while he was lying down and said, "I can't remember exactly how many times I shot him when he was on the ground. But I know I shot him when he was on the ground, but I can't say I shot him in the back." He did not intend to shoot the victim in the back. Defendant felt remorse over the shooting and "was always concerned about what was going on with [the victim]." He "never wanted to kill the man," and he did not expect him to die from the shots Defendant inflicted. He intended to shoot the victim "where [he knew he] wasn't going to kill him, because [he] didn't want to kill him."

Defendant could not "really specifically remember" where he got the gun with which he shot the victim. He had it about a year or two prior to this incident and was not aware it was stolen when he bought it. He had other guns, but he had "done got rid of them because [his] mama done found them around the house and she don't like that around the house[.]" Defendant always kept a gun around the house because he "just always felt like [he] had to protect [his] family." The gun was Defendant's way of stopping the victim "if he started to acting [sic] up[.]" It "was always to [sic] [his] house under the step." Defendant occasionally heard gunshots in his neighborhood, where drugs and guns were common, and Thompson's house had been burglarized. Defendant agreed to tell Detective Shane Duplechain where to find the gun if he let Defendant talk to Thompson.

Some of the evidence, as in *Dubroc*, 755 So.2d 297, supports Defendant's claim that he acted in defense of Thompson, his mother. Broussard testified the victim grabbed Thompson as if he were going to hit her. Defendant thought the victim was approaching his mother to harm her. Thus, the record shows some support for Defendant's position, but not sufficient evidence to reverse the lower court.

13

However, Defendant was a convicted felon who should not have carried a gun or have had easy access to one. He opted against legal means of protecting his mother and in favor of means that could have resulted in the victim's death. Defendant at least temporarily disabled the victim with the first two shots, providing an opportunity for his mother and him to exit the situation. Instead, Defendant intentionally stood over the victim and shot him twice more, inflicting life-threatening injuries, as he lay rolling on the ground. Even assuming the first two shots were fired in defense of Thompson, we find the circumstances of the last two indicate the jury could reasonably have found Defendant was no longer acting in Thompson's defense and had the specific intent to kill. Thus, the first two shots could reasonably be considered to be subjectively necessary on Defendant's part, but the last two shots were not an objectively reasonable use of force designed merely to protect Thompson or anyone else involved.

Further, the jury obviously found Figaro and the victim's testimony to be more credible than that of Thompson, Broussard, and Paris. This court will not impinge on that credibility determination. Regardless of whether the incident occurred in Thompson's yard or in the street, and regardless of whether the victim ever touched Thompson, those last two shots provide sufficient evidence of Defendant's specific intent to kill the victim.

### ASSIGNMENT OF ERROR NUMBER ONE

Defendant contends the trial court erred by denying his motion for mistrial. During Defendant's testimony, counsel for the State asked him if he was aware the gun involved in the incident had been reported stolen. Defendant's counsel objected, and the trial court overruled the objection. Defendant explained he did not know the gun was stolen when he bought it. Testimony continued, and when

the court took a lunch break, Defendant moved for a mistrial, arguing the State assassinated his character by introducing evidence of his possession of a stolen gun.

A mistrial may be granted when a legal defect exists in the proceedings "which would make any judgment entered upon a verdict reversible as a matter of law[.]" La.Code Crim.P. art. 775(A)(3). Thus, the introduction of evidence of other crimes is a valid basis for a motion for mistrial.

> [M]istrial is a drastic remedy that is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial . . . . The determination of whether actual prejudice has occurred lies within the sound discretion of the trial judge; this decision will not be overturned on appeal absent an abuse of that discretion.

*State v. Weary,* 03-3067, p. 36 (La. 4/24/06), 931 So.2d 297, 321, *cert. denied,* 549 U.S. 1062, 127 S.Ct. 682 (2006) (citations omitted). The denial of a motion for mistrial on the basis of the introduction of other crimes evidence is subject to a harmless error analysis. *State v. Johnson*, 94-1379 (La. 11/27/95), 664 So.2d 94. An error is harmless when the "verdict actually rendered was surely unattributable to the error." *Id.* at 102 (citing *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078 (1993)).

One might surmise the jury found Defendant guilty of the lesser offense of attempted manslaughter because he stood over the victim and inflicted two life-threatening wounds, not because he did so with a stolen gun. Evidence showed Defendant had purchased the gun and illegally had it in his possession. The jury would have reached the same verdict, based on the evidence, even if evidence had shown the gun was not stolen. Thus, the introduction of evidence of the other crime of possession of a stolen gun, if error at all, was harmless. This perceived

15

error does not provide a valid basis for a mistrial, and the trial judge did not abuse his discretion in denying the motion.

## ASSIGNMENT OF ERROR NUMBER THREE

Defendant argues the trial court imposed constitutionally excessive consecutive sentences without stating any aggravating or mitigating circumstances to warrant such severe sentences. He asks this court to vacate his sentences and remand this case for resentencing in accordance with La.Code Crim.P. art. 894.1. Alternatively, Defendant argues his trial counsel was ineffective for failing to object to the sentences imposed or failing to file a motion to reconsider his sentence.

### *Excessive consecutive sentences*

Louisiana Code of Criminal Procedure Article 881.1(E) requires a defendant to make or file a motion to reconsider his sentence within thirty days of imposition of the sentence. A defendant who fails to make or file such a motion is precluded from raising any objection to the sentence on appeal. *State v. White*, 03-1535 (La.App. 3 Cir. 4/28/04), 872 So.2d 588; *State v. Prudhomme*, 02-511 (La.App. 3 Cir. 10/30/02), 829 So.2d 1166, *writ denied*, 02-3230 (La. 10/10/03), 855 So.2d 324.

This court recently held a defendant waived his right to seek review of his sentence where he lodged no objection to his sentence at trial and failed to file a motion to reconsider. *State v. Duplantis*, 13-424 (La.App. 3 Cir. 11/27/13), 127 So.3d 143. Nevertheless, this court noted the defendant received a legal sentence, as did Defendant here. Thus, his assignment of error concerning sentencing lacked merit.

16

Even so, this court has reviewed claims of excessiveness where the defendant made no objection and did not file a motion to reconsider his sentence. *See State v. Johnlouis*, 09-235 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, __ U.S. __, 131 S.Ct. 932 (2011); *State v. Thomas*, 08-1358 (La.App. 3 Cir. 5/6/09), 18 So.3d 127; *State v. Perry*, 08-1304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, *writ denied*, 09-1955 (La. 6/25/10), 38 So.3d 352; *State v. H.J.L.*, 08-823 (La.App. 3 Cir. 12/10/08), 999 So.2d 338, *writ denied*, 09-606 (La. 12/18/09), 23 So.3d 936; *State v. Quinn*, 09-1382 (La.App. 3 Cir. 5/12/10), 38 So.3d 1102, *writ denied*, 10-1355 (La. 1/7/11), 52 So.3d 885; *State v. Bergeron*, 12-71 (La.App. 3 Cir. 10/3/12), 99 So.3d 90, *writ denied*, 12-2388 (La. 4/26/13), 112 So.3d 837; *State v. Barnes*, 12-667 (La.App. 3 Cir. 12/5/12), 103 So.3d 1254; *State v. Arceneaux*, 12-1047 (La.App. 3 Cir. 4/3/13), 111 So.3d 1177. Accordingly, we will review Defendant's assignment of error as a bare claim of excessiveness. *State v. Baker*, 08-54 (La.App. 3 Cir. 5/7/08), 986 So.2d 682.

This court has previously discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (citations omitted) (second alteration in original).

Defendant was exposed to a sentence of up to twenty years for his conviction for attempted manslaughter. La.R.S. 14:27, 14:31. Thus, he received the maximum sentence possible for the offense. He was exposed to a sentencing range of ten to twenty years for possession of a firearm by a convicted felon. La.R.S. 14:95.1(B). Thus, he received the minimum sentence possible for that offense.

Even though a penalty falls within the statutory sentencing range, it may still be unconstitutionally excessive:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061 (citations omitted). "[T]he trial judge need not articulate every aggravating and mitigating circumstance outlined in art. 894.1[;] the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983) (citing *State v. Ray*, 423 So.2d 1116 (La.1982); *State v. Keeney*, 422 So.2d 1144 (La.1982); *State v. Duncan*, 420 So.2d 1105 (La.1982)).

"[M]aximum sentences are reserved for cases involving the most serious violations of the charged offense and for the worst kind of offender." *State v. Quebedeaux*, 424 So.2d 1009, 1014 (La.1982) (citing *State v. Jones*, 398 So.2d 1049 (La. 1981)). "The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." La.Code Crim.P. art. 881.4(D).

The defendant received a twenty-year sentence for attempted manslaughter and a ten-year sentence for possession of a firearm by a convicted felon in *State v. Maze*, 09-1298 (La.App. 3 Cir. 5/5/10), 36 So.3d 1072. The sentences, however, were ordered to run concurrently. There, the defendant broke out the window of the motel room of his ex-wife and her boyfriend while armed with a shotgun and fired twice. One shot hit the boyfriend, and the second shot went through the wall and seriously injured a man in the adjacent room. The defendant had three prior felony convictions; in each case, his parole or probation had been revoked. He did not appeal his conviction for possession of the firearm.

This court held the defendant had been charged with attempted second degree murder and had received considerable benefit through his guilty plea to a lesser offense. Under those circumstances and considering the defendant's "serious offense committed without regard for human life, which resulted in serious injury to the victims," this court affirmed his maximum sentence for attempted manslaughter. *Id. at* 1076.

In *State v. Blanche*, 47,014 (La.App. 2 Cir. 4/25/12), 92 So.3d 508, the defendant was charged with attempted second degree murder and possession of a firearm by a convicted felon. The mother of his child returned to the home they shared and found him inside with another woman. The victim broke a window, and the defendant pulled a gun from under the mattress and shot her in the neck.

She stayed in the hospital for three weeks; a bullet lodged in her shoulder could not be removed because the attempt could leave her paralyzed. The defendant fled the scene of the shooting and discarded the gun under a neighboring house.

A jury convicted the defendant of attempted manslaughter and possession of a firearm by a convicted felon. The trial court imposed the maximum sentence on each count and ordered the sentences to run consecutively.[2] The second circuit considered the defendant's "violent and extensive criminal history, his lack of remorse and [his] failure to be rehabilitated by previous leniency in sentencing" and affirmed his sentences. *Id.* at 519.

Here, Defendant consistently testified he could have killed the victim but intentionally aimed to inflict non-lethal wounds, and he acted in defense of his mother. He left nine rounds in the gun when he could have continued to shoot the victim. His prior felony conviction was for second degree battery. Defendant had been in jail for two years at the time of his sentencing. During that time, he had begun to work on his GED and had completed a behavior emotions class. He believed the classes had helped him "a lot," and he would not do things the same way now "if [he] could have another chance."

At his sentencing hearing, Defendant told the trial judge he had thought about what happened, and he "felt like what [he] did [he] had to do." The victim did not die because Defendant did not want to kill him. Defendant accepted the responsibility for the shooting and felt he was wrong for shooting the victim. However, he did not understand why he could not protect himself and his family from something that happened in his yard. He did not understand why the victim

---

[2]At the time of the offense, the maximum sentence for possession of a firearm by a convicted felon was fifteen years.

was not in jail with him. He admitted he "overreacted when [he] shot [the victim]."

The trial judge explained why he imposed the maximum sentence of twenty years for attempted manslaughter. He stated:

> [E]ven taking that the first two (2) shots may have been in defense of your mother, the second two (2) shots were clearly wrong, okay. And the second (2) shots are what concerns me even more so than the first two (2) shots; that you walked up to him because he cussed you, in testimony, or said something bad about you, or still talking about you or something, you walked over, in my opinion, pretty callously and shot him two (2) more times while he was laying on the ground. So, those second two (2) shots are more concerning to me than the first two (2) shots, because maybe you might have had some defense on the first two (2) shots, but not on the second.

This court agrees with the trial judge and finds the callous nature of the shooting warrants the length and consecutive nature of the sentences.

### Ineffective assistance of counsel

Alternatively, Defendant argues his counsel was ineffective for failing to object to the imposition of the sentences and for failing to file a motion to reconsider his sentences. The issue of ineffective counsel is more appropriately addressed in an application for post-conviction relief, where an evidentiary hearing can be conducted in the trial court. *State in the Interest of A.B.*, 09-870 (La.App. 3 Cir. 12/9/09), 25 So.3d 1012. However, where an ineffective assistance claim is raised on appeal, this court may address the merits of the claim if the record discloses sufficient evidence to rule on it. *Id.* If this court considers a claim of ineffective counsel on appeal, Defendant must satisfy a two-part test. He must first show counsel's performance was deficient and next, that the deficiency prejudiced him. S*trickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

This court declines to review the sentences, Defendant would have to show he would have received lesser sentences but for counsel's deficiency in order to prevail in this argument. The record here is not sufficient to determine that issue, and this argument can be more appropriately addressed in post-conviction relief.

## DISPOSITION

For the reasons expressed in this opinion, we hereby affirm Defendant's convictions and sentences.

**CONVICITIONS AND SENTENCES AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICAITON. Uniform Rules—Courts of Appeal. Rule 2–16.3.