NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-275

STATE OF LOUISIANA

VERSUS

GLENN VON ROSS

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 22544-13
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

**********

BILLY HOWARD EZELL
JUDGE

**********

Court composed of Jimmie C. Peters, Billy Howard Ezell, and Shannon J. Gremillion, Judges.

AFFIRMED; REMANDED WITH INSTRUCTIONS.

**John Foster DeRosier**
**District Attorney**
**Karen C. McLellan**
**Assistant District Attorney**
**Fourteenth Judicial District Court**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward John Marquet**
**Louisiana Appellant Project**
**Post Office Box 53733**
**Lafayette, LA 70505-3733**
**(337) 237-6841**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Glenn Von Ross**

**EZELL, Judge.**

On September 12, 2013, the defendant, Glenn Von Ross, was charged by grand jury indictment with three separate counts: Count one: Possession of CDS II (crack cocaine) with the intent to distribute, a violation of La.R.S. 40:967(A)(1); Count two: Possession of CDS II (powder cocaine) with the intent to distribute, a violation of La.R.S. 40:967(A)(1); and Count three: Possession of CDS I (methylenedioxymethamphetamine (MDMA)) with the intent to distribute, a violation of La.R.S. 40:966(A)(1). Thereafter, on November 7, 2013, the indictment was amended to charge the following: Count one: Possession of CDS II (cocaine) between 28 to 200 grams, a violation of La.R.S. 40:967(F)(1)(a); Count two: Possession of CDS II (cocaine)[1] with the intent to distribute, a violation of La.R.S. 40:967(A)(1); and Count three: Possession of CDS I (methylmethcathinone (methylone))[2] with the intent to distribute, a violation of La.R.S. 40:966(A)(1). The defendant entered pleas of not guilty to the charges.

On the first day of trial, April 23, 2014, the State informed the trial court that it was dismissing count two, possession of CDS II (cocaine) with the intent to distribute. Thus, the State proceeded to trial on the charges of possession of CDS II (cocaine) weighing between 28 and 200 grams and possession of CDS I (methylone) with the intent to distribute. On April 24, 2014, after a two-day trial, the defendant was found guilty of both counts by a vote of 10-2. At that time, the trial court ordered a presentence investigation (PSI) report and the State notified the court of its intent to file a habitual offender bill.

---

[1] The word "powder" was stricken.

[2] The words "methylenedioxymethamphetamine (MDMA)" were stricken.

At a hearing held August 29, 2014, the trial court was made aware that no presentence investigative report had been received. The trial court ordered the report returned to the court by December 1, 2014, and sentencing to be reset for December 5, 2014. The habitual offender hearing was also refixed for December 5, 2014. On December 5, 2014, the State notified the trial court that the habitual offender bill had been dismissed and that the State agreed not to refile the bill. The trial court sentenced the defendant on each count to twenty-five years in the Department of Corrections, to run concurrent with each other. Defense counsel objected to the sentences imposed.

On January 5, 2015, the defendant filed a motion for appeal and designation of record, which was signed by the trial court on that same date. Currently before this court is a brief filed by the defendant, alleging two assignments of error – one challenges the sufficiency of the evidence and the other asserts the excessiveness of the sentences imposed. For the following reasons, both assignments lack merit.

## FACTS

On July 17, 2013, a vehicle in which the defendant was a passenger was detained by police in response to a "shots fired" call. The defendant gave consent for his backpack to be searched. As a result, the police found a pill bottle containing both full and empty capsules, two of which tested positive for methylone. The police also found a "bandaid" box containing both powder and crack cocaine.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed errors patent on the face of the record. After reviewing the record, we find there are three errors patent.

2

First, the trial court did not impose a mandatory fine of not less than $50,000.00 nor more than $150,000.00 for the defendant's conviction of possession of 28 grams or more but less than 200 grams of cocaine as required by La.R.S. 40:967(F)(1)(a).

Next, at least five years of the defendant's sentence for possession with intent to distribute methylone was not imposed without benefit of parole. Louisiana Revised Statutes 40:966(B)(2) carries a penalty of not less than five nor more than thirty years at hard labor, at least five of which shall be served without benefit of parole, probation, or suspension of sentence. Both of the foregoing errors resulted in illegally lenient sentences. "However, this court will not consider an illegally lenient sentence unless it is a raised error." *State v. Celestine*, 11-1403, p. 2 (La.App.3 Cir. 5/30/12), 91 So.3d 573.

Finally, the record before this court does not indicate that the trial court advised the defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court should be directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of the opinion and to file written proof in the record that the defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## ASSIGNMENT OF ERROR NUMBER ONE

In this assignment of error, the defendant challenges the sufficiency of the evidence. Specifically, the defendant alleges that the State failed to prove that he possessed crack cocaine (count two) with the intent to distribute. We observe that the possession with the intent to distribute charge for which the defendant was tried

3

involved methylone, not crack cocaine. Although the defendant was originally charged in count two with possession with the intent to distribute cocaine, the State dismissed that charge on the day of trial. Thus, we will address the sufficiency of the evidence as to the defendant's possession with the intent to distribute methylone, not crack cocaine.

Additionally, the defendant alleges that the State failed to prove that the powder cocaine weighed at least 28 grams. We note, however, that the 28-200 grams of cocaine for which the defendant was accused of possessing was not limited to powder cocaine. Although the defendant was originally charged with one count of possession with the intent to distribute *crack* cocaine and one count of possession with the intent to distribute *powder* cocaine, the possession with the intent to distribute *crack* cocaine was amended to possession of *cocaine* between 28 to 200 grams, and the possession with the intent to distribute *powder* cocaine was amended to delete the word "powder." Eventually, the possession with the intent to distribute cocaine was dismissed. Thus, the defendant was tried on possession of cocaine between 28 to 200 grams, with no limitation as to the type of cocaine. We will review the sufficiency of the evidence accordingly.

*Standard of Review*

This court has stated the following regarding the standard for reviewing a claim of insufficient evidence:

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger,* 05–11, p. 91 (La.7/10/06), 936 So.2d 108, 170, *cert. denied,* 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville,* 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively

4

embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford,* 05–477, p. 6 (La.2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson,* 96–1048 (La.10/4/96), 680 So.2d 1165; *State v. Lubrano,* 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith,* 94–3116 (La.10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan,* 07–504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than ensuring the sufficiency evaluation standard of *Jackson,* "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert,* 97–64, pp. 4–5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726–27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve " 'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.' " *McDaniel v. Brown,* 558 U.S. [120], [134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother,* 09–2357, pp. 10–11 (La.10/22/10), 49 So.3d 372, 378 (alteration in original).

*State v. Francis*, 12-1221, pp. 6-7 (La.App. 3 Cir. 4/3/13), 111 So.3d 529, 533, *writ denied*, 13-1253 (La. 11/8/13), 125 So.3d 449 (alterations in original). As will be discussed below, we find that the evidence was sufficient to convict the defendant.

*Evidence Introduced at Trial*

The first witness to testify for the State was Detective Shaun Touchet, a police officer with the Lake Charles Police Department. On July 17, 2013, Detective Touchet responded to a "shots-fired" call involving a silver Honda. Detective Touchet spotted a silver Honda parked "just off the roadway, in an empty lot" with three occupants and a black male leaning into the front passenger window of the vehicle. When the detective made contact with the vehicle, all of the occupants were asked to get out. All occupants were patted down, and the driver gave permission to search the vehicle. According to Detective Touchet, the front passenger (the defendant) was acting nervous. Detective Touchet noticed a backpack sitting on the center console of the front seat, "kind of more towards the passenger seat." Detective Touchet testified that the defendant seemed nervous about the backpack and acted like he did not want to leave it when he got out of the vehicle. When asked if the backpack was his, the defendant stated that it was. The defendant also told Detective Touchet that he did not have a problem with the detective searching the backpack.

Detective Touchet told the defendant that he was concerned there was a weapon in the backpack. When the detective obtained the defendant's verbal consent to search the backpack, the detective put the backpack on the hood of the vehicle and immediately noticed a pill bottle in an open compartment. The pill bottle had no label and appeared to "have narcotics inside of it, pills." Detective Touchet then described the contents of the bottle as capsules:

6

A: They were - - in my opinion, it looked like they were fillable capsules, which, in my training and experience, I've seen that they take empty capsules and fill them with different types of narcotics, typically what we call molly, which is MDMA.

Q: And is there another name - - and can you explain to the Jury a little bit of what MDMA is, in a sense of why people take it, or anything like that, or another name maybe it's referred to as.

A: There's a lot of names for it, and I'm not sure what you're looking for. There's - - they have several different compounds in MDMA. So, like I said, they call it different names. They have methylone in 'em, they have - - sometimes they have methadone in 'em. They have a whole lot of different compounds inside of them. So, I'm not - - I'm not quite sure which one - - what you're looking for.

Q: Well, MDMA, is it one of the main ingredients in ecstasy as well?

A: Absolutely.

Detective Touchet testified that the capsules were clear with no label, which is not typical of a manufactured pill.

When Detective Touchet opened the pill bottle, he clearly saw what appeared to be "mollies." In the same area of the backpack, Detective Touchet saw a "band aid" box that appeared to have a small piece of cellophane sticking out of it, "like a baggie of some kind." When Detective Touchet opened the "band aid" box, he found "more narcotics, powder cocaine and crack cocaine." When asked how much cocaine he believed to be in the box, Detective Touchet responded:

A: Well, the powder cocaine looks like it was about an ounce of powder, and it was still - - it still had a shape to it, as if it was cut off the corner of what we refer to as a brick. But a kilo of cocaine is typically bundled a certain way, and it looked like it had been - - the corner had been cut off, and that's what you could - - you could actually see it inside the cellophane, that the corner of the kilo was inside there. And it looked like it was about an ounce of powder itself. And then I found two other bags. One had broken cookies, like quarter cookies in it, and then the other bag had actual rocks in it.

Detective Touchet then explained what he meant by "pieces of a cookie:"

A: Typically, whenever they make crack cocaine, the way they distribute it or how they make it is into the shape of a cookie. It's a round kind of disc, and it's - - we refer to it on the street as a cookie. Typically, it's - - a true cookie is 28 grams. Not everybody has 28-gram cookies because they make more money if they cut it more. But typically they will either sell it by the cookie, or they can quarter the cookie, or cut it in different shapes to sell it that way. And it's all by weight, of course, but they can cut it in different ways. And then sometimes they cut it all the way down to where it's small, and it looks like rocks. We refer to it as crack rocks.

Detective Touchet stated that the pill bottle contained "[n]inety something" capsules - some empty and some full. The detective estimated that there were seventy-eight full capsules. When asked if that was a typical amount someone would possess for personal use, Detective Touchet responded, "Absolutely not; that's distribution." Then, when asked if the mixture of full and empty capsules meant anything, Detective Touchet responded:

A: It does. Typically, when - - when you find that amount of full capsules, or you find empty capsules with - - with full capsules, they are not necessarily manufacturing it, but they're taking the powder and filling up the capsules. So they're manufacturing the complete product. So they're taking the empties and putting the powder in it so they can distribute it evenly with the capsules. That's typically what they do if you find the empties.

In Detective Touchet's opinion, if a person has more than five or six capsules of mollies, then distribution, not personal use, is intended.

According to Detective Touchet, the defendant made a couple of statements when he found out what he was being charged with. The defendant told the detective that "it was personal use and not distribution." When asked why he decided to charge the defendant with possession with intent to distribute, Detective Touchet replied:

A: Considering the circumstances and the amount of narcotics that were in the bag, I felt like he was trying to distribute that. And the

area that we were in, the fact that a gentleman was leaning in his window - -

. . . .

Q: And you had mentioned the area. Specifically, do you - - do y'all get called out to that area a lot?

A: We do. It's a high-crime area and a high narcotics area. There's - - there is a significant amount of drug sales and prostitution in that area as well.

. . . .

Q: When you're talking about narcotics, are you talking - - we're talking specifically about the cocaine right now?

A: Yes.

Q: Okay.

A: And that's why - - with the cocaine - - the crack and the powder cocaine, that's not personal use, so that's why I believe that it was - - his intent was to distribute that cocaine.

As for his reason for charging the defendant with possession with the intent to distribute the "suspected MDMA," Detective Touchet testified:

A: Along the same lines. Because there's such a large amount, and that he had empties that he can - - the empty capsules that he can fill to distribute those as well. That's not typically something you see over just typical use.

Finally, Detective Touchet testified that the defendant was the only person to claim the backpack and the narcotics.

On cross-examination, Detective Touchet admitted that he did not find any scales, knives, razors, or cutting boards when he searched the car. The detective also did not recall finding any empty plastic bags. Although he believed the car occupants had a standard amount of money on them, Detective Touchet did not find a large amount of money on the occupants. When asked to explain again why he felt the narcotics were not for personal use, Detective Touchet answered:

9

A: Based on the amount, and like I said, my training and experience, and the fact that the amount of narcotics is not something that someone purchases for personal use.

. . . .

A: Typically, narcotics users don't purchase bulk quantity of narcotics for personal use. Typically, they purchase whatever they can, and then they use it, and then they go buy more.

Detective Touchet further explained that an ounce of cocaine used over a week's period of time would probably kill a person.

On re-direct, Detective Touchet testified that scales and razors would not be needed in the present situation:

A: No. Typically, whenever they cut suspected crack rocks, it's not - - they're going to sell it by the rock and not necessarily by the weight at that point. Once they cut it down, they're selling it by the size. You know, if it's - - if it's a large crack rock, it'll sell for a little more than a smaller crack rock, but it's not weighed at that point.

Specifically addressing the MDMA, Detective Touchet opined that there would be no need for scales or razors since the powder is simply put "into the capsule maker."

As for the total suspected amount of cocaine, Detective Touchet testified that there was over 28 grams. As far as the suspected MDMA capsules, Detective Touchet testified that there were at least seventy-eight full capsules.

The next witness to testify for the State was Detective Jeremy Nunez of the Calcasieu Parish Sheriff's Office, Combined Anti-Drug Task Force. Detective Nunez was called out to the scene involving the defendant. When Detective Nunez arrived at the scene, Detective Touchet updated Detective Nunez on the investigation. When asked what his personal impression was during the investigation, Detective Nunez stated that he believed the defendant was in the area "possibly selling narcotics." The detective explained:

10

A:	Well, the people that we deal with on a regular basis - - we make undercover purchases throughout the parish.  These people are purchasing - - whenever they're - - if they were to purchase molly, they would go buy one to three capsules, maybe five, at the tops.

Q:	And I guess - - let me just clarify.  You talk about a person - - would it be for personal use?

A:	Personal use, that's correct.

Q:	Okay.  Go ahead.

A:	One to five capsules on a maximum for personal use.  Then you have people that use crack cocaine.  People that use crack cocaine aren't carrying around what he had, they're carrying around one to three rocks, at the most.

Detective Nunez estimated that the total amount of cocaine (powder and crack) found was over 28 grams.  People purchasing powder cocaine for personal use, Detective Nunez testified, usually purchase "anywhere from a quarter gram of powder cocaine up to a 3.30 grams, or an eight ball . . . ."  The powder cocaine found in the present case was more than half of an ounce.  According to Detective Nunez, a half of an ounce of powder cocaine is valued at $500.  When Detective Nunez prepared his supplemental report, he learned the powder cocaine was closer to one ounce, which would be valued at close to $1,000.00.

As for the "molly capsules," Detective Nunez opined that the defendant was filling the empty capsules with "some sort of bag of powder - - of MDMA or molly[.]"  The crack cocaine was in one clear plastic bag, broken into larger pieces.  Detective Nunez testified that the crack cocaine was not broken up into "smaller pieces like that - - what we see on the street as for distribution."  Then, when asked if the numerous pieces in the bag was consistent with personal use, Detective Nunez replied, "No."  The detective explained that a person using crack cocaine for personal use will possess one to three rocks about the size of a pencil eraser.

11

The pieces found in the present case were larger than a pencil eraser. Detective Nunez testified that there is a market for both powder and crack cocaine and that powder cocaine is also used in the manufacturing of crack cocaine. Although the defendant did not want to give a statement, Detective Nunez testified that the defendant blurted out that the drugs were all for personal use.

On cross-examination, when asked if it was common for people who are distributing drugs to have scales or baggies, Detective Nunez responded, "In some instances, yes, that's correct."

Tracy Legros, the Director of the Southwest Louisiana Crime Lab, testified by audio-visual testimony. Ms. Legros identified State's Exhibit Number 2 (submission number five) as a sealed brown envelope containing suspected pills. Ms. Legros stated that there was a plastic amber bottle containing twelve empty capsules, which were not tested. Seventy-one capsules containing a white powder were also found, two of which were tested.

State's Exhibit Number 4 (submission number two) was identified by Ms. Legros as a plastic baggie with off-white material weighing 8.3 grams. State's Exhibit Number 5 (submission number three) was next identified by Ms. Legros as a plastic baggie containing an off-white material weighing 7.6 grams. Finally, Ms. Legros identified State's Exhibit Number 6 (submission number four) as a plastic baggie containing an off-white material weighing 27.6 grams.

Ida Benoit, the Quality Assurance Manager at the Southwest Louisiana Crime Lab, also testified by audio visual testimony. Ms. Benoit identified State's Exhibit Numbers 4 and 5 (submission numbers two and three) as an off-white material containing cocaine base. Ms. Benoit identified State's Exhibit Number 6

(submission number four) as an off-white material containing cocaine.  When asked if the total weight of the cocaine exceeded 28 grams, Ms. Benoit testified:

> A:      The total weight of cocaine hydrocholoride is 27 grams.  And the total weight of cocaine base is close to 16 grams.  If you combine those two, yes, it is over 28 grams.

On cross-examination, Ms. Benoit explained that cocaine base is commonly known as crack, and cocaine hydrochloride is commonly known as cocaine.  The difference, Ms. Benoit explained, "would like be the difference between powdered milk and milk[,]" "[t]hey're the same thing, just one's in a different form."

Ms. Benoit identified State's Exhibit Number 2 (submission number five) as seventy-one capsules containing an off-white material, two of which were tested to contain methylone.  When asked to explain what methylone is, Ms. Benoit testified:

> A:      Methylone is in a group of chemicals commonly known as bath salts.  It is a compound that is related to the cathinone compound.  They just added on some extra pieces.

According to Ms. Benoit, methylone is "very structurally similar to MDMA."  Ms. Benoit further testified that "methylone or methyl cathinone" is a "Schedule I" stimulant.

*Possession with the Intent to Distribute Methylone*

The defendant was convicted of possession with the intent to distribute methylone.  In brief, appellate counsel asserts that the evidence was insufficient to prove possession with the intent to distribute, since the police did not witness any distribution, there was no testimony that the defendant was attempting to distribute drugs, and there was no evidence of scales, individually wrapped baggies, or other paraphernalia evidencing intent to distribute.  The State, on the other hand, asserts that it presented ample evidence to sustain the conviction.  We find the evidence

was sufficient to prove the defendant possessed methylone with the intent to distribute.

The State was required to prove that the defendant specifically intended to distribute the methylone. *See State v. Eubanks*, 12-896 (La.App. 3 Cir. 4/10/13), 112 So.3d 1064. This court has stated the following regarding factors to consider in determining whether specific intent to distribute has been proven:

> "Intent is a condition of mind which is usually proved by evidence of circumstances from which intent may be inferred." *State v. Hearold*, 603 So.2d 731, 735 (La.1992) (citations omitted). There are five factors courts consider to determine whether an intent to distribute can be inferred:
>
> > 1) whether the defendant ever distributed or attempted to distribute the drug; 2) whether the drug was in a form usually associated with possession for distribution to others; 3) whether the amount of drug created an inference of an intent to distribute; 4) whether expert or other testimony established that the amount of drug found in the defendant's possession is inconsistent with personal use only; and 5) whether there was any paraphernalia, such as baggies or scales, evidencing an intent to distribute.
>
> *Id.*

*Id.* at 1066 (citing *State v. Bivens*, 11-156 (La.App. 3 Cir. 10/5/11), 74 So.3d 782, 790, *writ denied*, 11-2494 (La. 3/30/12), 85 So.3d 115).

As set forth above, Detective Touchet saw someone leaning into the front passenger window of the vehicle in which the defendant was the front passenger, a fact the detective considered when deciding to charge the defendant with possession with the intent to distribute. Detective Touchet also testified that the area in which the vehicle was spotted was a high-narcotics area. Additionally, the amount of pills containing methylone in the defendant's backpack (seventy-four) was more than the typical amount associated with personal use. The empty

14

capsules, Detective Touchet testified, could be filled and distributed and were not typically associated with personal use. Detective Nunez agreed that a user would typically purchase only three to five "mollies" for his personal use.

Even though no bags, scales, or razors were found in the defendant's possession, the testimony was sufficient for the jury to find the defendant possessed methylone with the intent to distribute. As Detective Touchet testified, no scales or razors were necessary for distribution in the present case.

*Sufficiency of the Evidence as to Weight of Cocaine*

The defendant was also convicted of possessing cocaine weighing 28 to 200 grams. Appellate counsel asserts that the evidence was insufficient to find the defendant guilty of possession of 28 to 200 grams of cocaine since Ms. Legros testified that the powder cocaine weighed 27.6 grams. Appellate counsel argues:

> Nothing further is needed; 27.6 grams is not 28 grams. There is no law or precedent that indicates it must be rounded up. The lab analysts used precise and highly calibrated machines when taking measurements. Plain and simple, 27.6 is not 28.

As previously explained, the amended charge of possession of cocaine weighing 28 to 200 grams did not limit the cocaine to either powder or crack. Thus, the State was not limited to the weight of the powder cocaine. Ms. Benoit, the Quality Assurance Manager at the Southwest Louisiana Crime Lab, clearly testified that the total weight of cocaine found in the present case exceeded 28 grams. Thus, the evidence was sufficient to prove the defendant possessed 28 to 200 grams of cocaine.

For the foregoing reasons, this assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

The defendant asserts that the trial court erred in imposing an excessive sentence of twenty-five years at hard labor against a fifty-three-year-old man. The defendant was convicted of one count of possession of cocaine weighing 28 to 200 grams and one count of possession with the intent to distribute methylone. For the possession of cocaine weighing 28 to 200 grams, the defendant was exposed to a term of imprisonment at hard labor for not less than five years, nor more than thirty years (five years to be served without benefits), and to a fine of not less than $50,000.00, nor more than $150,000.00. La.R.S. 40:967(F)(1)(a) and (G). For the crime of possession of methylone with the intent to distribute, the defendant was exposed to a term of imprisonment at hard labor for not less than five years, nor more than thirty years, with at least five years of the sentence to be served without benefit of parole, probation, or suspension of sentence. La.R.S. 40:966(B)(2). The trial court sentenced the defendant to twenty-five years at hard labor on each count and ordered the sentences to run concurrently. Thus, on each count, the defendant was sentenced to five years less than the maximum term of imprisonment.

After the trial court imposed the sentences, defense counsel noted his objection to the sentences. No other objection or motion to reconsider sentence was made. Thus, this court's review of the defendant's sentences is limited to a "bare bones" excessiveness review. *See State v. Eubanks*, 12-896, p. 9 (La.App. 3 Cir. 4/10/13), 112 So.3d 1064, 1070. The law is well settled concerning the standard to be used in reviewing excessive sentence claims:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or

16

that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La.2/1/02), 808 So.2d 331.

. . . .[E]ven when a sentence falls within the statutory sentencing range, it still may be unconstitutionally excessive, and in determining whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has suggested that several factors may be considered:

[An] appellate court may consider several factors including the nature of the offense, the circumstances of - the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La.5/30/03), 845 So.2d 1061.

*State v. Decuir*, 10-1112, pp. 11-13 (La.App. 3 Cir. 4/6/11), 61 So.3d 782, 790-91.

(first and third alterations in original)

17

After the State announced its intent to dismiss the habitual offender bill against the defendant, defense counsel asked the court to consider the following when sentencing the defendant:

**MR. RICHARD:**

Your Honor, in considering your sentence, Mr. Ross has informed me that a lot of these - - or all of these charges are in his past, and these current ones were in support of a drug habit. And he would like to be able to have any kind of treatment options that DOC could provide while he's serving his sentence.

And, Your Honor, he also has no arrests at all for any crimes of violence or any sex crimes or anything of that nature. Most of his convictions have been drug-related.

. . . .

**MR. WILLIAMS:**

Ralph Williams, co-counsel in this matter, Your Honor. We would like to note that Mr. Ross is 52 years of age at this time. His last conviction was eight years ago, and I will suggest to the Court in the request for leniency that most statistics will indicate that an individual who approaches the age of 50 or who has attained the age of 50, generally those statistics indicate that that individual ends any - - or is likely - - more likely than not to end any further acts of a criminal nature.

So in our request for leniency by the Court, we will ask the Court or suggest to the Court that statistics will indicate that once Mr. Ross completes this sentence, he is not likely to return.

The State, however, asked the trial court to consider imposing the maximum sentences. The State recognized that because the offenses occurred at the same time, they would likely be ordered to run concurrently. The State argued, however, that maximum sentences were appropriate considering the defendant's criminal history and the amount of narcotics involved. In its brief on appeal, the State further asserts that had it not dismissed the habitual offender bill filed against the

defendant, the defendant would have faced life imprisonment as a fourth habitual offender.

The trial court stated the following before imposing sentence:

**THE COURT:**

All right. I sat through two trials with Mr. Ross. The first trial Mr. Ross was found not guilty. Although, as I viewed the evidence, I think it was very - - he was very fortunate just that the camera angles weren't - - weren't right on the undercover agent. And his lawyer did a good job of confusing the issues for the jury, but, you know, it looked like it was very clear to me that Mr. Ross, you know, was involved in that.

But, yeah, he was found not guilty, and it is what it is. And I'm not going to hold that against him in this - - in his sentence in this case, but I just - - one of the reasons I bring that up is that when I look at Mr. Ross's criminal history and how extensive it is, back from 1982, unauthorized use of a motor vehicle arrest, vehicle theft, unlawful possession of a pistol, and then another arrest in '85 for forgery over in Houston, and then '86, possession of stolen property here in Calcasieu Parish. Well,, [sic] that was a misdemeanor.

'88, burglary of a motor vehicle. He was sentenced to two years [in the] Texas Department of Corrections. '91, had some other charges. There's no disposition found. Also in '91, possession of CDS II with intent to distribute. He was found guilty by a jury on 6/24/93 and was sentenced to five years DOC with credit for time served.

Looks like he probably went to trial on that burglary. One thing, Mr. - - Mr. Ross exercises his right to jury trial for sure, and he's had at least three our [sic] four jury trials, and he was able - - he got found not guilty on this - - on one that I presided over. But anyway, he was found guilty by the jury in that possession with intent back in '91, sentenced to five years.

And in this particular case - - okay. Then in '96, he was charged with possession of cocaine, possession of marijuana with intent to distribute, possession of a firearm by a convicted felon, illegal use of U.S. currency and possession of drug paraphernalia.

He pled guilty to possession of large quantities of cocaine. This marijuana with intent was dismissed. Pled guilty to the possession of a firearm by a convicted felon charge. And the other - - the other charges were dismissed. He received ten years [with the] Department of Corrections without benefit of probation or parole.

19

In 2009, he had some felony - - produce, production, manufacture, distribution or possession with intent Schedule II and distribution of Schedule I. Anyway, those were dismissed in 2011.

He had some other charges from St. Landry Parish. No disposition was found. From 2011, he was arrested for the distribution, manufacture and possession with intent CDS II. That's the charge he was found not guilty on by the jury in June of 2013.

Now, the instant case, possession of CDS Schedule II between 28 and 200 grams, the jury found him guilty on that charge and guilty of the charge of possession of CDS I with intent to distribute.

And the amazing thing is he had been in jail for almost two years at the time he was found not guilty by the jury. In about five weeks' time, after he was released from jail, after being found not guilty, he gets arrested for these new charges of possession of CDS II between 28 and 200 grams, possession of CDS I with intent to distribute.

So he didn't have any sense of - - you know, he went right back to doing the only thing he's ever seemed to do in his adult lifetime which is to deal drugs. And that's all he knows.

And, you know, Mr. Ross, at some point you have to care about people in this world if you're ever going to have - - you know, make good decisions. But if you're only - - if you only use people and, you know, and you don't care about their well-being when you're selling them poison that destroys their lives - - and that's how you make a living is by helping people destroy their lives, and you don't care at all about the people whose lives are being destroyed and their children that are being affected and all the other family members that are being affected by the stuff that you're - - that you made a lifetime of - - or that you've done for a lifetime, you know, as your business.

I respect what you said, and I think a lot of - - generally speaking, I think that's true, Mr. Williams. But, you know, some people - - I've sentenced some 60-something-year-old drug dealers, 70-year-old drug dealers. Some people don't ever stop, because apparently that's all they know, like Mr. Ross. That's all he knows.

And when you have no respect for human life, for other people, and you just use them to make money no matter how bad what you're selling to them hurts them or perpetuates the destruction of their lives, I don't know what more you could really want.

You know, you had a chance. You had a golden opportunity to walk away with a fresh start in your life when that jury found you not

20

guilty, but your arrogance and your lack of concern for anybody else just led you right back to doing what you do. Within a few weeks you were arrested again with even more drugs than you had the first time.

So anyway, I think because of all of that - - and let me just say this. For the record, I have reviewed the pre-sentence report.

. . . .

All right. All right. Well, I have reviewed the pre-sentence report, and I have - - I presided over the trials, or this trial when he was convicted, and I have reviewed the history. I have not received any letters of support or - - either opposing or supporting Mr. Ross, and I have considered - - reviewed and considered all the aggravating and mitigating factors set forth in Article 894.1.

And just because of the lifelong history of Mr. Ross and dealing drugs and helping to destroy people's lives the way he has, I'm going to - - I'm going to sentence you, Mr. Ross, to 25 years [with the] department of corrections - -

. . . .

- - on each count. [A]nd I will run that time - - I will allow that time to be concurrent with one another.

In response, the defendant told the court that he had never been "rehabbed," that he used drugs because of a disability, and that he did not sell any drugs. The trial court told the defendant that a twenty-five year sentence might make the State feel less inclined to charge the defendant as a habitual offender, a charge that could expose the defendant to life without benefits. Finally, the trial court recommended the defendant be allowed to participate in any programs available through the Department of Corrections.

Considering the defendant's criminal history and the reasons given by the trial court, we find the sentences imposed are not excessive. Furthermore, the Court notes that similar sentences have been imposed. In *State v. Harris*, 48,659 (La.App. 2 Cir. 5/28/14), 140 So.3d 1226, *writ denied*, 13-2771 (La. 7/31/14), 147 So.3d 168, *writ denied*, 14-1312 (La. 2/5/15), 158 So.3d 810, Harris was sentenced

21

to twenty-five years at hard labor (five without parole) for possession of 28-200 grams of cocaine, five years at hard labor for battery of a police officer, and twenty-five years at hard labor for possession of marijuana with the intent to distribute. The sentences were ordered to run concurrently.

In *State v. Clark*, 05-61 (La.App. 5 Cir. 6/28/05), 909 So.2d 1007, *writ denied*, 05-2119 (La. 3/17/06), 925 So.2d 538, the defendant was sentenced to twenty-five years at hard labor for possession with the intent to distribute cocaine. The State originally charged Clark as a third habitual offender but later withdrew the bill. The presentence investigation report showed Clark was a fourth felony offender and admitted to previously abusing marijuana, crack cocaine, and alcohol.

In *State v. Jacobs*, 08-1068 (La.App. 3 Cir. 3/4/09), 6 So.3d 315, *writ denied*, 09-755 (La. 12/18/09), 23 So.3d 931, the defendant was sentenced to thirty years at hard labor, five of which was to be served without benefits, for possession of cocaine weighing between 28 and 200 grams. The excessiveness of his sentence was not challenged on appeal.

Finally, we observe the supreme court's repeated admonition "that sentence review under the Louisiana constitution does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is more appropriate in a given case." *State v. Savoy*, 11-1174, p. 5 (La. 7/2/12), 93 So.3d 1279, 1283 (citing *State v. Walker*, 00-3200 (La. 10/12/01), 799 So.2d 461; *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957; and *State v. Humphrey*, 445 So.2d 1155 (La.1984)). Considering the facts of this case, the defendant's prior criminal history, the jurisprudence, and the supreme court's admonition, we find the sentences imposed in the present case are not excessive.

Accordingly, this assignment lacks merit.

**DECREE**

The defendant's convictions and sentences are affirmed. The trial court is ordered to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of the opinion and to file written proof in the record that the defendant received the notice.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal. Rule 2–16.3.